**PERKINS COIE LLP**
David T. Biderman (*Admitted Pro Hac Vice*)
4 Embarcadero Center, Suite 2400
San Francisco, CA 94111
Phone: 415-344-7000
Fax: 415-344-7050

Charles C. Sipos (*Admitted Pro Hac Vice*)
1201 Third Avenue, Suite 4800
Seattle, WA  98101
Phone:  206-359-8000
Fax:  206-359-9000

**BLANK ROME LLP**
Stephen M. Orlofsky
David C. Kistler
New Jersey Resident Partners
301 Carnegie Center, 3rd Floor
Princeton, NJ  08540
Phone:  609-750-2646
Fax:  609-897-7286

*Attorneys for Defendant,*
*GENERAL MILLS, INC.*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| IN RE GENERAL MILLS INC. KIX CEREAL LITIGATION | **Case No. 2:12-cv-249-KM-JBC** |

**DEFENDANT GENERAL MILLS, INC.'S RESPONSE TO PLAINTIFFS' STATEMENT OF MATERIAL FACTS NOT IN DISPUTE IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT; AND**

**DEFENDANT GENERAL MILL'S SUPPLEMENTAL STATEMENT OF UNDISPUTED MATERIAL FACTS IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Pursuant to Local Rule of Civil Procedure 56.1 of the United States District Court for the District of New Jersey, Defendant General Mills, Inc. ("General Mills") submits the following response to Plaintiffs' Statement of Material Facts Not in Dispute in Support of Plaintiffs' Motion for Partial Summary Judgment and Defendant General Mill's Supplemental Statement of Disputed Material Facts In Opposition to Plaintiff's Motion for Partial Summary Judgment.

<u>**Response to Plaintiffs' Statement of Facts**</u>

**Plaintiff's Statement No. 1:**

Defendant General Mills makes and markets Original Kix, Berry Berry Kix, and Honey Kix cereals (collectively, "Kix"). (General Mills, Inc.'s Answer to Class Action Complaint in *Bevans v. General Mills, Inc.*, ECF No. 105 ("Bevans Answer") ¶ 2; General Mills, Inc.'s Answer to Class Action Complaint in *Marcus v. General Mills, Inc.*, ECF No. 107 ("Marcus Answer") ¶ 14; General Mills, Inc.'s Answer to Second Amended Class Action Complaint in *Zardeneta v. General Mills, Inc.*, ECF No. 109 ("Zardeneta Answer") ¶ 3; General Mills, Inc.'s Answer to Class Action Complaint, *Kellogg v. General Mills, Inc.*, No. 2:14-cv- 05565-KM-SCM (D.N.J. Oct. 16, 2014), ECF No. 38 ("Kellogg Answer") ¶14.)

**General Mills' Response:**

Admitted that General Mills sells Kix brand cereal to wholesalers and some retailers who, in turn, sell Kix cereals to end purchasers and that Kix products are available in "Original," "Honey," and "Berry Berry" varieties.

**Plaintiff's Statement No. 2:**

Starting in 2009, General Mills began to claim on the front of boxes of Original Kix that it was "Made with All Natural Corn." (Keenan Decl., Ex. 1 (Defendant General Mills, Inc.'s Responses and Objections to Plaintiffs' First Set of Requests for Admission (Amended) ("1st RFA Resp.") No. 4 at 14-19); Keenan Decl., Ex. 3 (Deposition of Claudia Klug (Aug. 19, 2014)) at 30:18-31:1.)

**General Mills' Response:**

Admitted that starting in 2009 certain Kix cereal boxes contained the phrase "Made with

All Natural Corn."

**Plaintiff's Statement No. 3:**

In 2010, General Mills introduced Berry Berry Kix and Honey Kix and similarly began to claim that they were "Made with All Natural Corn." (1st RFA Resp. Nos. 5-6 at 19-26.)

**General Mills' Response:**

Admitted that "Made with All Natural Corn" appeared on boxes of Berry Berry Kix and Honey Kix in 2010.

**Plaintiff's Statement No. 4:**

General Mills removed the "Made with All Natural Corn" claim from Kix packaging in 2013. (Keenan Decl., Ex. 5 (Declaration of Carla Vernon (Sept. 11, 2014)) ¶ 2 at 2; Keenan Decl., Ex. 6 (Declaration of Brad Hiranaga (Sept. 11, 2014)) ¶ 3 at 2.)

**General Mills' Response:**

Admitted that in 2013 General Mills made the decision to remove the statement "Made With All Natural Corn" from Kix cereal packaging.

**Plaintiff's Statement No. 5:**

Corn is the primary ingredient in Kix. (Keenan Decl., Ex. 7 (GMI_KIX00000150; GMI_KIX00000186; GMI_KIX00000191).)

**General Mills' Response:**

Admitted that Kix contains corn.

**Plaintiff's Statement No. 6:**

Kix is made with GE corn.  (Keenan Decl., Ex. 2 (Defendant General Mills, Inc.'s Responses and Objections to Plaintiffs' Second Set of Requests for Admission) ("2d RFA Resp.") Nos. 1-3 at 4-6; Keenan Decl., Ex. 4 (Deposition of Carla Vernon (Nov. 14, 2014)) at 83:21-23; Keenan Decl., Ex. 8 (Deposition of Sarah Geisert (May 21, 2013)) at 43:18-44:1 & 48:16-49:9; Expert Declaration of Charles M. Benbrook, Ph.D., dated June 19, 2015 ("Benbrook Decl.") ¶ 9(a).)

**General Mills' Response:**

Admitted that some of the corn used in Kix cereal between January 2006 and the present was grown from seed produced through bioengineering.

**Plaintiff's Statement No. 7:**

The GE corn that was used to make Kix was genetically engineered to tolerate herbicides and resist insects. (Benbrook Decl. ¶¶ 9(b) & (c).)

**General Mills' Response:**

Admitted that some of the corn used in Kix cereal between January 2006 and the present was grown from seed produced through bioengineering.

**Plaintiff's Statement No. 8:**

As of 2013, GE corn accounted for 90% of the corn acreage planted in the United States. (Keenan Decl., Ex. 9 (Nat'l Agric. Statistics Serv., U.S. Dep't of Agric., Acreage (2013)) ("2013 USDA Acreage Data") at 25.)

**General Mills' Response:**

Admitted that the document cited by Plaintiffs for this statement, titled "Corn Biotechnology Varieties as a Percent of All Corn Planted —States and United States" states that altogether, "biotech" varieties of corn accounted for ninety percent of all corn planted in the United States.

**Plaintiff's Statement No. 9:**

As of 2013, herbicide-tolerant GE corn accounted for 85% of the corn acreage planted in the United States. (2013 USDA Acreage Data at 25; 2d RFAs No. 10 at 14.)

**General Mills' Response:**

Admitted that as of 2013, approximately 85% of the corn planted acreage in the United States was from seeds containing a gene making the corn resistant to certain herbicides.

**Plaintiff's Statement No. 10:**

As of 2013, insect-resistant GE corn accounted for 76% of the corn acreage planted in the United States. (2013 USDA Acreage Data at 25; 2d RFAs Nos. 11-12 at 15.)

**General Mills' Response:**

Admitted that according to United States Department of Agriculture statistics, as of 2013 approximately 76% of the corn planted acreage in the United States was from seeds containing a gene from the soil bacterium bacillus thuringiensis, which is toxic to certain insects.

**Plaintiff's Statement No. 11:**

As of 2013, GE corn that was both herbicide-tolerant and insect-resistant accounted for 71% of the corn acreage planted in the United States. (2013 USDA Acreage Data at 25.)

**General Mills' Response:**

Admitted that the document cited by Plaintiffs for this statement, titled "Corn Biotechnology Varieties as a Percent of All Corn Planted —States and United States," states that in 2013 71% of the corn planted in the United States was a "stacked gene variety," which the document defines as including "only those containing biotech traits for both herbicide and insect resistance."

**Plaintiff's Statement No. 12:**

In 2011, American farmers planted 92.28 million acres of corn. (Keenan Decl., Ex. 10 (Nat'l Agric. Statistics Serv., U.S. Dep't of Agric., Acreage (2011) ("2011 USDA Acreage Data")) at 6.)

**General Mills' Response:**

Admitted that the document cited by Plaintiffs for this statement, titled "Corn Area Planted for All Purposes and Harvested for Grain — States and United States," states that 92,282,000 acres of corn were planted in 2011.

**Plaintiff's Statement No. 13:**

The Monsanto Company ("Monsanto") reported that in 2011, American farmers planted 79 million acres of corn seed with genetically engineered traits that Monsanto had developed. (Keenan Decl., Ex. 13 (Monsanto, Monsanto Supp. Information for Investors (Jan. 5, 2012) ("Monsanto Investor Data")) at 3.)

**General Mills' Response:**

Admitted that the document cited by Plaintiffs for this statement, titled, "Reference Resource: Monsanto Supplemental Information for Investors," states that in 2011 79 "biotech acres" of corn were planted in the United States.

**Plaintiff's Statement No. 14:**

In 2009, American farmers planted 86.48 million acres of corn. (Keenan Decl., Ex. 11 (Nat'l Agric. Statistics Serv., U.S. Dep't of Agric., Acreage (2010) ("2010 USDA Acreage Data")) at 5.)

**General Mills' Response:**

Admitted that the document cited by Plaintiffs for this statement, titled "Corn: Area Planted for All Purposes and Harvested for Grain by State and United States, 2009-2010," states that 86,482,000 acres of corn were planted in the United States in 2009.

**Plaintiff's Statement No. 15:**

In 2009, Monsanto reported that American farmers planted 70.6 million acres of corn seed with genetically engineered traits that Monsanto had developed. (Monsanto Investor Data at 3; *see also* Keenan Decl., Ex. 12 (Monsanto, Monsanto Biotechnology Trait Acreage: Fiscal Years 1996-2009 (Oct. 7, 2009) ("Monsanto 2009 Data")).)

**General Mills' Response:**

Denied.  Neither document cited by Plaintiffs for this statement supports it.

**Plaintiff's Statement No. 16:**

Of the 70.6 million acres of GE corn seed planted in 2009 with traits that Monsanto had developed, 69.8 million acres were genetically engineered to tolerate herbicides. (Monsanto 2009 Data.)

**General Mills' Response:**

Denied.  Neither document cited by Plaintiffs for this statement supports it.

**Plaintiff's Statement No. 17:**

Monsanto has described GE seeds as having had "their genetic makeup altered to exhibit

traits that are not naturally theirs." (Bevans Answer ¶ 5; Zardeneta Answer ¶ 21; Kellogg Answer ¶ 9; Marcus Answer ¶9.)

**General Mills' Response:**

Admitted that Monsanto has stated that Monsanto has used the quoted language when describing genetically modified organisms.

**Plaintiff's Statement No. 18:**

The World Health Organization has described GE seeds as those which have had their genetic material "altered in a way that does not occur naturally." (Bevans Answer ¶ 26; Zardeneta Answer ¶ 23; Kellogg Answer ¶ 17; Marcus ¶ 9.)

**General Mills' Response:**

Admitted that the World Health Organization's Website has used the quoted language on its website when discussing genetically modified organisms.

**Plaintiff's Statement No. 19:**

Romer Labs, a company that works with the agricultural industry, has stated that scientists genetically engineer plants so that the resulting GE crop can "express novel traits that normally would not appear in nature." (Bevans Answer ¶ 27; Zardeneta Answer ¶ 22.)

**General Mills' Response:**

Admitted that the Romer Labs has used the quoted language on its website when discussing genetically modified plants.

**Plaintiff's Statement No. 20:**

Most GE corn grown in the United States is genetically engineered to tolerate herbicides and/or resist insects. (2013 USDA Acreage Data at 25; Benbrook Decl. ¶ 29.)

**General Mills' Response:**

Admitted.

**Plaintiff's Statement No. 21:**

GE corn cannot be created without the use or manipulation of bacterial or viral DNA. (Benbrook Decl. ¶¶ 29, 47, 58-61, 67, 73, 79-81 & 96.)

**General Mills' Response:**

Denied.  (McHughen Decl. ¶ 20.)

**Plaintiff's Statement No. 22:**

GE corn contains sequences of DNA called promoters that control when a gene is turned

on (i.e., expressed) and at what level. (*Id*. ¶¶46(j) & (l), 67-70 & 73.)

**General Mills' Response:**

Admitted that all corn, genetically engineered corn and non-genetically engineered corn,

contains promoters that control when a gene is turned on (i.e., expressed) and at what level.  The

remainder of the statement is denied.  (McHughen ¶ 20.)

**Plaintiff's Statement No. 23:**

The promoters used in GE corn originate from bacteria, viruses, or species other than

corn. (*Id*. ¶¶ 66, 112-113, 120 n.8, 135, 143-44.)

**General Mills' Response:**

Admitted that genetically-engineered corn may contain promoters that originate from

species other than corn.

**Plaintiff's Statement No. 24:**

GE corn contains sequences of DNA called terminators that control when a gene is turned

off (i.e., no longer expressed). (*Id*. ¶¶ 46(j) & (l), 71 & 73.)

**General Mills' Response:**

Admitted that all corn, genetically engineered corn and non-genetically engineered corn,

contains sequences of DNA called terminators that control when a gene is turned off. The

remainder of the statement is denied.  (McHughen Dec. ¶ 20.)

**Plaintiff's Statement No. 25:**

The terminators used in GE corn originate from bacteria, viruses, or species other than

corn. (*Id*. ¶¶ 112 n.7, 120 n.8, 135 & 143-44.)

**General Mills' Response:**

Admitted that genetically-engineered corn may contain terminators that originate from

species other than corn.

**Plaintiff's Statement No. 26:**

GE corn is created through the use of a transgene or gene cassette containing sequences of manipulated genetic material. (*Id.* ¶¶ 9(d), 46(l) & 65-90.)

**General Mills' Response:**

Admitted that genetically-engineered corn is created through the use of a transgene or gene cassette containing sequences of selected genetic material.  The remainder of the statement is denied.  (McHughen Dec. ¶ 20.)

**Plaintiff's Statement No. 27:**

There is no natural way to transfer a transgene containing ordered sequences of manipulated genetic material from different organisms into a target plant's genome. (*Id.* ¶ 76.)

**General Mills' Response:**

Denied.  (McHughen Decl. ¶¶ 67-89; 138-145.)

**Plaintiff's Statement No. 28:**

A transgene is transferred into a target plant's genome through the use of a bacterium or a gene gun. (*Id.* ¶¶ 75-87.)

**General Mills' Response:**

Admitted that genetically-engineered corn is created through a process of horizontal gene transfer.  There are several methods used to transfer genes into a plant's genome, including but not limited to, through the use of Agrobacterium or particle delivery.

**Plaintiff's Statement No. 29:**

Herbicide-tolerant GE corn has been genetically engineered to withstand the application of a specific family of herbicides that would otherwise kill or severely damage the plant. (*Id.* ¶ 46(h).)

**General Mills' Response:**

Admitted.

**Plaintiff's Statement No. 30:**

Most GE corn planted in the United States between 2009 and 2013 was genetically engineered to tolerate herbicides. (*Id.* ¶ 29; 2013 USDA Acreage Data; 2011 USDA Acreage Data; 2010 USDA Acreage Data; Monsanto Investor Data at 3; Monsanto 2009 Data.)

**General Mills' Response:**

Admitted that the 2013 USDA Acreage Data cited by Plaintiffs provides that 14 percent of the total corn planted in the US was herbicide resistant in 2013 and 21 percent in 2012. Admitted that the 2011 USDA Acreage Data provides that 23 percent of the total corn planted in the US was herbicide resistant for 2010 and 2011.  Admitted that the 2010 USDA Acreage Data provides that 22 percent of the total corn planted in the US was herbicide resistant for 2009.  The Monsanto 2009 Data document cited by Plaintiff does not provide information to substantiate the statement made by Plaintiffs.  The exhibit is incorrectly formatted and cuts the figures off so the viewer cannot see them.  The Monsanto Investor Data does not contain any support for the statement made by Plaintiffs.

**Plaintiff's Statement No. 31:**

The most common versions of herbicide-tolerant corn are so called "Roundup Ready" varieties, sold or licensed by Monsanto, that have been engineered to tolerate the application of the herbicide glyphosate, which Monsanto sells under the brand name Roundup. (Benbrook Decl. ¶¶98 & 132.)

**General Mills' Response:**

Admitted that there are herbicide-tolerant corn varieties called "Roundup Ready" that were developed by Monsanto.  The Roundup Ready corn varieties are able to tolerate the application of the herbicide glyphosate, which is the active ingredient in a Monsanto product called Roundup.

**Plaintiff's Statement No. 32:**

Roundup Ready 2 corn contains the sequence for the CP4-EPSPS gene. (*Id.* ¶¶ 133-34 & 141-49.)

**General Mills' Response:**

Admitted that the CP4 gene confers resistance to RoundUp.

**Plaintiff's Statement No. 33:**

The CP4-EPSPS gene is a modified version of a gene extracted from a bacterium. (*Id*. ¶ 134.)

**General Mills' Response:**

The CP4-EPSPS gene is a version of a gene extracted from a bacterium. The remainder of the statement is denied.  (McHughen Decl. ¶ 20.)

**Plaintiff's Statement No. 34:**

The CP4-EPSPS gene causes Roundup Ready 2 corn to produce a modified version of the EPSPS enzyme, which makes the corn able to tolerate the herbicide glyphosate. (*Id*. ¶¶ 142-49.)

**General Mills' Response:**

Admitted.

**Plaintiff's Statement No. 35:**

Roundup Ready 2 corn contains DNA from the Cauliflower Mosaic Virus. (*Id*. ¶ 135.)

**General Mills' Response:**

Admitted.

**Plaintiff's Statement No. 36:**

The Cauliflower Mosaic Virus DNA used in Roundup Ready 2 corn is modified to work as a promoter for the CP4-EPSPS gene. (*Id*. ¶¶ 135 & 144.)

**General Mills' Response:**

The Cauliflower Mosaic Virus DNA used in Roundup Ready 2 corn works as a promoter for the CP4-EPSPS gene.  The remainder of the statement is denied.  (McHughen Decl. ¶ 20.)

**Plaintiff's Statement No. 37:**

Roundup Ready 2 corn contains DNA (NOS 3') extracted from the bacterium Agrobacterium tumefaciens. (*Id*. ¶ 135.)

**General Mills' Response:**

Admitted.

**Plaintiff's Statement No. 38:**

The NOS 3' DNA used in Roundup Ready 2 corn is modified to work as a terminator for the CP4-EPSPS gene. (*Id*. ¶¶ 135 & 143-44.)

**General Mills' Response:**

The NOS 3' DNA used in Roundup Ready 2 corn works as a terminator for the CP4-EPSPS gene.  The remainder of the statement is denied.  (McHughen Decl. ¶ 20.)

**Plaintiff's Statement No. 39:**

Insect-resistant GE corn has been genetically engineered to express one or more endotoxins that are toxic to certain insects. (*Id*. ¶ 46(i).)

**General Mills' Response:**

Admitted that insect-resistant GE corn is toxic to certain insects only.  See  McHughen ¶ 40 for a more comprehensive discussion.

**Plaintiff's Statement No. 40:**

Most GE corn planted in the United States between 2009 and 2013 was genetically engineered to produce one or more Bt endotoxins. (*Id*. ¶ 29; 2013 USDA Acreage Data; 2011 USDA Acreage Data; 2010 USDA Acreage Data; Monsanto Investor Data at 3; Monsanto 2009 Data.)

**General Mills' Response:**

Admitted that the 2010 through 2013 USDA Acreage Data documents provide that the following percentages of BT corn were planted in the US as compared to total corn planted in the US: 17% in 2009, 16% in 2010 and 2011, 15% in 2012, and 5% in 2013.  The Monsanto 2009 Data document cited by Plaintiff does not provide information to substantiate the statement made by Plaintiffs.  The exhibit is incorrectly formatted and cuts the figures off so the viewer cannot see them.  The Monsanto Investor Data does not contain any support for the statement made by Plaintiffs.

**Plaintiff's Statement No. 41:**

The most common versions of YieldGard corn are engineered to produce modified versions of either the Cry1Ab endotoxin or the Cry3Bb1 endotoxin, or both. (Benbrook Decl. ¶ 98.)

**General Mills' Response:**

Admitted.

**Plaintiff's Statement No. 42:**

YieldGard corn with Bt protection against the Corn Borer ("YieldGard Corn Borer") contains a modified version of a gene extracted from the soil bacterium Bt that causes the corn plant to produce a modified version of the endotoxin Cry1Ab. (*Id.* ¶¶ 111-17.)

**General Mills' Response:**

YieldGard corn with Bt protection against the Corn Borer ("YieldGard Corn Borer") contains a version of a gene extracted from the soil bacterium Bt that causes the corn plant to produce a version of the endotoxin Cry1Ab.  The remainder of the statement is denied. (McHughen ¶ 20.)

**Plaintiff's Statement No. 43:**

YieldGard Corn Borer corn contains DNA from the Cauliflower Mosaic Virus. (*Id.* ¶¶ 112-13.)

**General Mills' Response:**

Admitted that YieldGuard Corn Borer contains the 35s promoter that derives from the Cauliflower mosaic virus.

**Plaintiff's Statement No. 44:**

The Cauliflower Mosaic Virus DNA used in YieldGard Corn Borer corn is modified to work as a promoter for the gene that produces the Cry1Ab endotoxin. (*Id.*)

**General Mills' Response:**

The Cauliflower Mosaic Virus DNA used in YieldGard Corn Borer corn works as a promoter for the gene that produces the Cry1Ab endotoxin. The remainder of the statement is

denied.  (McHughen ¶ 20.)

**Plaintiff's Statement No. 45:**

YieldGard Corn Borer corn contains DNA (NOS 3') extracted from the bacterium

Agrobacterium tumefaciens. (*Id*. ¶ 112 n.7.)

**General Mills' Response:**

Admitted.

**Plaintiff's Statement No. 46:**

The NOS 3' DNA used in YieldGard Corn Borer corn is modified to work as a terminator

for the gene that produces the Cry1Ab endotoxin. (*Id*.)

**General Mills' Response:**

The NOS 3' DNA used in YieldGard Corn Borer corn works as a terminator for the gene

that produces the Cry1Ab endotoxin. The remainder of the statement is denied.  (McHughen

¶20.)

**Plaintiff's Statement No. 47:**

YieldGard corn with Bt protection against the Rootworm ("YieldGard Rootworm")

contains a modified version of a gene extracted from the soil bacterium Bt that causes the corn

plant to produce a modified version of the endotoxin Cry3Bb. (I. ¶¶ 120 n.8 & 121.)

**General Mills' Response:**

YieldGard corn with Bt protection against the Rootworm ("YieldGard Rootworm")

contains a version of a gene extracted from the soil bacterium Bt that causes the corn plant to

produce a version of the endotoxin Cry3Bb.  The remainder of the statement is denied.

(McHughen ¶ 20.)

**Plaintiff's Statement No. 48:**

YieldGard Rootworm corn contains DNA from both wheat and the Cauliflower Mosaic

Virus. (*Id*. ¶ 121.)

**General Mills' Response:**

Admitted.

**Plaintiff's Statement No. 49:**

The DNA from wheat and the Cauliflower Mosaic Virus used in YieldGard Rootworm corn is modified to work as promoters for the gene that produces the Cry3Bb endotoxin. (*Id.* ¶¶ 121-23.)

**General Mills' Response:**

The DNA from wheat and the Cauliflower Mosaic Virus used in YieldGard Rootworm corn work as promoters for the gene that produces the Cry3Bb endotoxin. The remainder of the statement is denied.  (McHughen ¶ 20.)

**Plaintiff's Statement No. 50:**

YieldGard Rootworm corn contains DNA (NOS 3') extracted from the bacterium Agrobacterium tumefaciens. (*Id.* ¶ 120.)

**General Mills' Response:**

Admitted.

**Plaintiff's Statement No. 51:**

The NOS 3' DNA used in YieldGard Rootworm corn is modified to work as a terminator for the gene that produces the Cry3Bb endotoxin. (*Id.*)

**General Mills' Response:**

Admitted that the NOS 3' DNA used in YieldGard Rootworm corn works as a terminator for the gene that produces the Cry3Bb endotoxin. Denied as to the remainder.  (McHughen ¶20.)

**Plaintiff's Statement No. 52:**

Roundup Ready corn is protected by, among others, U.S. Patent No. 6,040,497. (Keenan Decl., Ex. 14 (Monsanto, Product Patents, http://www.monsanto.com/products/pages/product-patents.aspx (last visited Mar. 19, 2014).)

**General Mills' Response:**

Denied.  The webpage provided by Plaintiff for support for the cited statement states: "Roundup Ready® Corn 2 is protected by one or more of the following U.S. Patent No(s).: – 5,554,798; 5,593,874; 5,641,876; 5,717,084; 5,728,925; 5,859,347; 6,025,545; 6,083,878;

6,825,400; 7,582,434; 8,273,959; RE39247."

**Plaintiff's Statement No. 53:**

Roundup Ready 2 corn is protected by, among others, U.S. Patent Nos. 6,825,400 and RE39247. (*Id.*)

**General Mills' Response:**

Admitted that the webpage provided by Plaintiffs for support for the cited statement states: "Roundup Ready® Corn 2 is protected by one or more of the following U.S. Patent No(s).: – 5,554,798; 5,593,874; 5,641,876; 5,717,084; 5,728,925; 5,859,347; 6,025,545; 6,083,878; 6,825,400; 7,582,434; 8,273,959; RE39247."

**Plaintiff's Statement No. 54:**

YieldGard Corn Borer corn is protected by, among others, U.S. Patent No. 6,180,774. (*Id.*)

**General Mills' Response:**

Admitted that the webpage provided by Plaintiffs for support for the cited statement states: "YieldGard® Corn Borer corn is protected by one or more of the following U.S. Patent No(s).: – 5,593,874; 5,859,347; 6,180,774."

**Plaintiff's Statement No. 55:**

YieldGard Corn Borer with Roundup Ready 2 corn is protected by, among others, U.S. Patent Nos. 6,180,774, 6,825,400, and RE39247. (*Id.*)

**General Mills' Response:**

Admitted that the webpage provided by Plaintiffs for support for the cited statement states: "YieldGard® Corn Borer with Roundup Ready® Corn 2 is protected by one or more of the following U.S. Patent No(s).: – 5,554,798; 5,593,874; 5,641,876; 5,717,084; 5,728,925; 5,859,347; 6,025,545; 6,083,878; 6,180,774; 6,825,400; 7,582,434; 8,273,959; RE39247."

**Plaintiff's Statement No. 56:**

YieldGard Rootworm corn is protected by, among others, U.S. Patent Nos. 6,063,597 and 6,501,009. (*Id.*)

**General Mills' Response:**

Admitted that the webpage provided by Plaintiffs for support for the cited statement states: "YieldGard® Rootworm corn is protected by one or more of the following U.S. Patent No(s).: – 6,063,597; 6,501,009; 7,408,096; 7,544,862; 7,705,216."

**Plaintiff's Statement No. 57:**

YieldGard Rootworm with Roundup Ready 2 corn is protected by, among others, U.S. Patent Nos. 6,063,597, 6,501,009, 6,825,400, and RE39247. (*Id.*)

**General Mills' Response:**

Admitted that the webpage provided by Plaintiffs for support for the cited statement states: "YieldGard® Rootworm with Roundup Ready® Corn 2 is protected by one or more of the following U.S. Patent No(s).: – 5,554,798; 5,593,874; 5,641,876; 5,717,084; 5,728,925; 5,859,347; 6,025,545; 6,063,597; 6,083,878; 6,501,009; 6,825,400; 7,408,096; 7,544,862; 7,582,434; 7,705,216; 8,273,959; RE39247."

## GENERAL MILLS' STATEMENT OF UNDISPUTED FACTS IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

1.      For close to three decades, the federal agencies charged with ensuring the safety and integrity of the United States' food supply have approved the use of bioengineered food for human consumption.  Kistler Decl. ¶ 2, Ex. A. (McHughen Decl. ¶ 38).

2.      Bioengineered crops undergo a rigorous safety review as part of a coordinated framework implemented by the United States' Food and Drug Administration ("FDA"), the United States Department of Agriculture ("USDA"), and the United States' Environmental Protection Agency ("EPA").  *Id* ¶ 152; Kistler Decl. ¶ 11, Ex. J, at p. 1-37 (Pew Initiative on Food and Biotechnology. *Guide to U.S. Regulation of Genetically Modified Food and Agricultural Biotechnology Products*, at p. 1, available at

http://www.pewtrusts.org/~/media/legacy/uploadedfiles/wwwpewtrustsorg/reports/food_and_bio

technology/hhsbiotech0901pdf.pdf. (last visited Aug. 10, 2015)).

3.     Because bioengineered corn is no different than non-bioengineered corn from a

nutritional, allergenic, or safety perspective, the FDA does not require bioengineered corn to be

labeled differently than non-bioengineered corn, emphasizing there is no "material" difference

between the two.  Kistler Decl. ¶ 2, Ex. A. (McHughen Decl. ¶¶ 138-142, 146-153); Kistler Decl.

¶ 12, Ex. K, at p.7  (FDA. 2001. *DRAFT Guidance for Industry: Voluntary Labeling Indicating*

*Whether Foods Have or Have Not Been Developed Using Bioengineering; Draft Guidance*,

available at

http://www.fda.gov/food/guidanceregulation/guidancedocumentsregulatoryinformation/labelingn

utrition/ucm059098.htm (last visited Aug. 10, 2015)).

4.     Bioengineering has widespread acceptance and currently comprises over 90% of

the United States corn acreage.  Kistler Decl. ¶ 13, Ex. L. (Nat'l Agric. Statistics Serv., U.S.

Dep't of Agric., Acreage (2015)).

5.     Throughout decades of this continuous and widespread use, bioengineered crops

have a spotless safety record.  Kistler Decl. ¶ 2, Ex. A. (McHughen Decl. ¶¶ 146-153).

6.     Several peer-reviewed published studies attest to the safety of bioengineered

crops, and in the decades since their use began there has not been a single reported safety

incident associated with their human consumption.  *Id.* ¶¶ 146-148, 152-153.

7.     Studies purporting to suggest safety concerns with bioengineered crops have been

resoundingly discredited.  *Id.* ¶¶ 150-52.

8.    General Mills does not conduct special testing for Kix cereal to determine the specific source of the corn used or whether that corn is bioengineered.  Kistler Decl. ¶ 19, Ex. Q, at p. 4. (GMI discovery responses).

9.    [Intentionally Left Blank]

10.    Bioengineered corn is, like virtually all crops used in modern agriculture, the product of human intervention designed to manipulate the plant's genetic structure and confer certain traits beneficial to the crop or to the farmer who plants it.  Kistler Decl. ¶ 2, Ex. A. (McHughen Decl. ¶¶ 51-55, 70-71, 97-137).

11.    The most common varieties of bioengineered corn have been designed to (1) defend against the corn borer worm, a common pest that feeds on and damages corn plants, or (2) carry resistance to glyphosate, an herbicide widely used in commercial farming.  *Id.* ¶ 39.

12.    Bioengineered crops are produced through transgenic technologies that effect gene transfer among different species.  *Id.* ¶¶ 31, 51-55, 70-76.

13.    Transgenic technologies work by identifying and isolating a specific portion of a genome in one organism (for pest-resistant corn, a specific portion of the genome from *Agrobacterium*) and then inserting those genes into the genome of the corn plant.  *Id.* ¶¶ 70-74.

14.    An organism's "genome" is the complete set of genetic material present in cell or organism. *Id.* ¶ 2.c n.1.

15.    "Horizontal" gene transfer involves the non-sexual (i.e., "horizontal") transfer of genes between two different species.  *Id.* ¶ 67-96; Exs. R-X.

16.    Charles Benbrook is an economist who works as a part-time consultant to the organic food industry.  Kistler Decl. ¶ 4, Ex. C. (Benbrook Dep. 8:4-9:8; 242:18-245:12).

17.    Benbrook is not a plant geneticist and has no direct experience in plant breeding or transgenic technologies.  *Id.* (Brenbrook Dep. 9:20-21; 10:6-10:7; 11:12-12:4).

18.    Benbrook opines that transgenic technologies that effect horizontal gene transfer "have no counterpart in nature and will never be replicated in the natural world without direct human intervention."  He does this without any citation to relevant scientific literature and provides no other basis for his opinion.   Kistler Decl. ¶ 27, Ex. Y. (Benbrook Decl. ¶ 9.e).

19.    Benbrook asserts that bioengineered corn is "inherently artificial and differ[s] in profound ways from non-engineered corn, and hence [is] also not natural."  *Id.* (Benbrook Decl. ¶ 97).

20.    General Mills retained Dr. Alan McHughen to respond to Benbrook's testimony. Kistler Decl. ¶ 2, Ex. A. (McHughen Decl. ¶ 1).

21.    Dr. McHughen, Biotechnology Specialist and Geneticist at the University of California, Riverside, is a molecular geneticist with a doctorate in plant science from Oxford University.  *Id.* ¶¶ 3-4.

22.    Dr. McHughen has held several appointments with the National Academy of Sciences on topics related directly to transgenic technologies and bioengineering, conducted extensive research on those technologies, and developed commercial crop varieties using different plant breeding techniques including genetic engineering.  *Id.* ¶¶ 5-8.

23.    As explained by Dr. McHughen, the basic premise of Benbrook's testimony—that horizontal gene transfer is "unnatural" because it has no counterpart in nature—is simply wrong. *Id.* ¶¶ 67-97; Exs. R-X.

24.     Developments in genetics have allowed for full genomic sequencing that enables a detailed examination of an organism's genetic makeup to determine the origin and characteristics of that organism's genetic code.  *Id.* at n.3.

25.     For example, a recent peer-reviewed article examining the genome of wild sweet potatoes confirms the presence of functional genes in sweet potatoes transferred by *Agrobacterium. Id.* ¶¶ 80-81.

26.     This is precisely the same kind of horizontal gene transfer—both in function and result—that is used to produce bioengineered corn.  *Id.* ¶ 80.

27.     This means that the same horizontal gene transfer used to make bioengineered corn occurred on its own, in nature, with sweet potatoes.  *Id.*

28.     When questioned in deposition about the occurrence of horizontal gene transfer, Dr. Benbrook was forced to backpedal and admit that it does "occur in nature," but then attempted to discredit it as "not common."  *Id.* ¶ 87; Kistler Decl. ¶ 4, Ex. C. (Benbrook Dep. 127:16-127:23).

29.     Horizontal gene transfer has been observed and documented in other plants, as well as in higher organisms.  Kistler Decl. ¶ 2, Ex. A. (McHughen Decl. ¶¶ 84-85; Exs. R-X).

30.     The sequencing of the human genome has revealed that over 8% of our DNA originated in viruses and became a part of the human genome through horizontal gene transfer. *Id.*; Kistler Decl. ¶ 2, Ex. A. (McHughen Decl. ¶¶ 84-85).

31.     Existing research documents more than two hundred instances of horizontal gene transfer that has occurred in nature and without human intervention.  *Id.* ¶ 85; Exs. R-X.

32.     Virtually all crops and agricultural breeding methods have derived from some form of human intervention.  Kistler Decl. ¶ 2, Ex. A. (McHughen Decl.  ¶¶ 2.b, 66 n.2, 90-123.

33.     Conventional agriculture is premised on human intervention to obtain a desired result that would not have occurred absent that intervention.  *Id.* ¶ 97-107

34.     Forced breeding of plants to create hybrids, the use of pesticides or insecticides, irrigation are all human efforts intended to produce an outcome that nature would not have otherwise produced.  *Id.* ¶ 90-105.

35.     Benbrook proffered testimony in the *GMA v. Sorrell* case.  In that case he proffered certain definitions that Plaintiff proffers here.  Kistler Decl. ¶ 14, Ex. M, at p. 19-23 (declaration of Charles Benbrook submitted on behalf of the State in *GMA v. Sorrell*).

36.     Benbrook also opined in the *GMA v. Sorrell* case that bioengineered crops are not "natural" because "biotechnology companies…assert in their own patent applications that the traits and [bioengineered] crops are unique and non-natural because of the insertion and expression of foreign DNA." *Id.*  (*GMA* Declaration ¶ 21).

37.     Benbrook has no experience in patents generally or patent law specifically, admitting, "I am not a practicing expert in patent law."  Kistler Decl. ¶ 4, Ex. C. (Benbrook Dep. 35:21-36:7).

38.     Benbrook holds no patents himself in the field of plant genetics or in any other field; he has never written a patent.  *Id.* (Benbrook Dep. 28:11-12; 35:8-35:20).

39.     Benbrook's "analysis" thus consisted of simply choosing a selection of patents for bioengineered corn at random, reading those patents and, then, based apparently on his familiarity with the English language, identifying the words that he believed corroborated his pre-existing conclusions about the supposed non-natural status of bioengineered corn.  *Id.* (Benbrook Dep. 45:22-46:24; 54:8-54:22).

40.     Plants, including plants produced through conventional breeding methods and plants approved for use in organic crops, may be patented so long as the plant breeder combines existing plants in a way that produces some novel trait in the newly-produced variety.  Kistler Decl. ¶3, Ex. B. (Godici Decl. ¶ 19-26).

41.     In July 2015 more than thirty patents issued for non-bioengineered plant varieties produced through traditional breeding methods.  *Id.* ¶ 33.

42.     Related authority further demonstrates that Plaintiffs' contention that there is a prohibition on patenting anything "natural" is a fiction.  *Id.* ¶ 22-26.

43.     The United States Patent Office, in its published guidance on patentability of "Nature-Based Products," explains that two "naturally occurring" elements can be combined in a novel way, and a patent awarded for the resulting product.  *Id.* ¶ 24 (USPTO Guidance for "Nature Based Products," at p. 16-17, explaining that when "naturally occurring" goat milk is combined with two "naturally occurring" strains of bacteria to create a low-fat yogurt, the resulting product "qualifies as eligible subject matter"); *see also id.* ¶ 23 (USPTO Guidance, at p. 1-2, explaining that it is patentable subject matter to combine a "naturally occurring [] juice" with a "naturally occurring preservative[] such as Vitamin E," where the resulting food product would spoil less quickly than the juice otherwise would without the preservative).

44.     In reviewing patent applications for patentability under the above standards the USPTO does not apply any formal or informal definition of "natural"—the office has no such definition.  *Id.* ¶ 15.

45.     Nor does the USPTO consider what consumers think a specific term in a patent means, or what that term might connote to the overall patented material.  *Id.* ¶ 16-18.

46.     Rather, the USPTO reviews the patent to make sure that the inventor is not attempting to claim protection for laws of nature or "wild" plants or other natural phenomena, and instead is only claiming protection for natural constituents are combined in an innovative way by the inventor.  *Id*. ¶ 19-22.

47.     Plaintiffs' *per se* ban on the use of "natural" for any patented crop would effectively ban the patenting of crops produced through conventional breeding methods.  *Id.* ¶ 33.

48.     Benbrook testified as follows: "Q: If a plant is patentable, does that necessarily make it unnatural? A: No." *See* Kistler Decl. ¶ 4, Ex. C. (Benbrook Dep. 8:1-8:3); *see also id.* (Benbrook Dep. 125:24-126:1) ("Q: So the fact that this plant is patented doesn't make it unnatural, right? A: In and of itself, no.").

49.     Benbrook further testified that patentability does not make something unnatural, and said he would not be comfortable relying on the fact of a patent to reach that conclusion.  *Id.* (Benbrook Dep. 261:18-262:8) ("Q. Dr. Benbrook, would you take a look, please, at Exhibit-7, which is the patent on a rice plant that you were asked about earlier today. Are you looking at Exhibit-7? A. Yes, I have that exhibit in front of me. Q. Can you determine from the extent to which you have been able to review this document, whether the subject of this patent is natural? A. Certainly based on my -- you know, I have not read the full patent and I obviously don't know the details of all the claims that are made in it, but based on what I can glean from just this cursory examination, *I see no reason that stands out that the rice, the hybrid rice varieties produced by this would inherently be unnatural*.") (emphasis added).

50.     Patent applicants are their own lexicographers and may describe their invention in the terms of their choosing.  Kistler Decl. ¶ 3, Ex. B. (Godici Decl. ¶ 27).

51.     The words chosen by a patent applicant are not dispositive in categorizing the interpretation of a claimed invention for all purposes. *Id.*  The words used by the patent applicants are therefore not dispositive of the determination of whether something is "natural." *Id.* ¶¶ 16, 27-30.

52.     The patentee in U.S. Patent No. 6,180,774 is merely using the term "synthetic" to differentiate between their novel invention and the "wild" version of the gene unaltered by the inventor.  *See* Kistler Decl. ¶ 16, Ex. O. (U.S. Patent No. 6,180,774).

53.     U.S. Patent No. 6,180,774 states: "[I]t is an object of the present invention to provide synthetic DNA sequences that are capable of expressing their respective proteins at relatively higher levels than the corresponding wild-type DNA sequence and methods for the preparation of such sequences." *Id.*  (Column 3, lines 52-56).

54.     The use of the term "synthetic" by the inventor in U.S. Patent No. 6.180,774 distinguishes the patented invention (which applies inventive power to a naturally occurring phenomena) from the corresponding "wild" version (which has no inventive power).  *Id.*

55.     By the time of his deposition, Benbrook had not read the Plaintiffs' testimony on subject of the definition of "natural" or any other subject.  *See* Kistler Decl. ¶ 4, Ex. C. (Benbrook Dep. 84:1-84:5) ("Q: You don't have any knowledge of what any of the named plaintiffs' definitions of natural are, do you? A: Correct. I have not spoken with them.").

56.     Benbrook disagreed with the definitions of "natural" that Plaintiffs testified to in deposition and offered in their Interrogatory responses.  *Compare id.* (Benbrook Dep. 72:6-75:2) *with* Kistler Decl. ¶ 6, Ex. E. (Marcus Dep. 110:11-110:15); Kistler Decl. ¶ 7, Ex. F. (Zardeneta Dep. 50:2-50:12; 23:20-23:24); Kistler Decl. ¶ 8, Ex. G. (Kellogg Dep. 119:2-119:3; 122:8-

122:15); Kistler Decl. ¶ 5, Ex. D. (Bevans Dep. 113:8-113:13); Kistler Decl. ¶ 17, Ex. P.

(Plaintiffs' Response to Interrogatory No. 9).

57.     Benbrook did not know the plaintiffs' identities, and at one point speculated that

they might be experts in the field of bioengineering.  Kistler Decl. ¶ 4, Ex. C. (Benbrook Dep.

82:15-82:17) ("Q: How about Robin Marcus? A: No, they may be scientists that I've read papers

of, but I don't know them personally.").

58.     Benbrook disagreed with USDA and FDA definitions of "natural," as well as

General Mills' own internal standard for use of that term, which is tethered to the FDA and

USDA criteria. *Compare id.* (Benbrook Dep. 77:17-80:1) *with* Kistler Decl. ¶ 10, Ex. I. (USDA

definition of "natural," at 117); Kistler Decl. ¶ 9, Ex. H. (FDA definition of "natural," at 2407).

59.     In deposition, Benbrook opined that: "[T]he core features or attributes of a natural

corn crop is, would be that the genetics of the corn have not been altered in some way by acts of

man, by plant breeders, to change the inherent genetic makeup or augment the corn genome in

bringing about a new corn variety."  *Id.* (Benbrook Dep. 57:24-58:4).

60.     Virtually every crop used in modern agriculture—organic crops, crops bred

through conventional breeding methods, and bioengineered crops—have had their genetics

altered in some way by acts of man in ways that change the inherent genetic makeup or augment

the corn genome.  Kistler Decl. ¶ 2, Ex. A. (McHughen Decl. ¶¶ 2.b, 96, 125).

61.     Corn's very existence as a crop suitable for human consumption was brought

about by centuries of intentional and human-directed breeding practices to transform the

otherwise inedible weed teosinte into what is consumed today as corn.  *Id.* ¶¶ 125-26.

62.     Benbrook's limitations on use of the word "natural" would prohibit its use for

almost every agriculture-based commodity that humans eat.  *Id.* ¶¶ 2.b, 66 n.2, 90-123.

63.     Benbrook testified as follows:

> Q:  Would you agree that there is a debate  in the
> scientific community regarding what the definition
> of natural is as it relates to crops?
> A: Certainly, yeah, there's debate and discussion
> about that, yeah.
> Q: Would you agree that some scientists have
> proffered, you know, certain definitions of natural
> and others have proffered different definitions of
> natural?
> A: Yes, I'm sure that there are different definitions
> of natural in lots of different contexts, in published
> literature and in scientific statements, yes, there's
> definitely a range.
> Q: Would you agree as it relates to crops that
> scientists have proffered different definitions of
> natural?
> A: Yes, different definitions have been proffered
> and different criteria for applying the definitions
> and, yes.
> Q: Would you agree that some of the definitions
> that have been proffered are broad and some of
> them are more narrow?
> A: Yes, I would agree with that statement.

Kistler Decl. ¶ 4, Ex. C. (Benbrook Dep. 65:4-66:5)

64.     Benbrook testified that the definition of "natural" is something on which people

can disagree, based on their understanding of plant breeding and whatever resulting opinions

they choose to form based on that understanding. *Id.* (Benbrook Dep. 63:9-63:14 ("Q: You agree

that two different people could have two different opinions on whether it was natural based on

what they knew of the process? A: Sure, yeah, people can differ.").

65.     Benbrook rejected the patent-based standard Plaintiffs' Motion tries to embrace.

*Id.* (Benbrook Dep. 8:1-8:3) ("Q: If a plant is patentable, does that necessarily make it unnatural?

A: No.").

66.     Benbrook testified in the *GMA* case referenced above that bioengineered crops are

not "natural" because of the methods used to cultivate them and because patents have been

issued for those crops. *See* Kistler Decl. ¶ 14, Ex. M. (Benbrook *GMA* Declaration ¶¶ 21-23).

67.     Benbrook does not agree with the definitions of "natural" proffered by the Plaintiffs, the FDA, or the USDA.  *Compare*  SOF ¶ 56; Kistler Decl. ¶ 4, Ex. C. (Benbrook Dep. 78:16-80:1) *with* Kistler Decl. ¶ 10, Ex. I. (USDA definition of "natural," at 117); Kistler Decl. ¶ 9, Ex. H. (FDA definition of "natural," at 2407).

68.     Benbrook testified that within the scientific community and among reasonable persons generally, opinions vary on what "natural" does or should mean.  Kistler Decl. ¶ 4, Ex. C. (Benbrook Dep. 62:18-63:19; 65:4-66:4).

69.     Scientific literature evidences that horizontal gene transfer, which is the basic process used to create bioengineered crops, is a phenomena documented as occurring in plants and other organisms in nature and without human intervention.  Kistler Decl. ¶ 2, Ex. A. (McHughen Decl. ¶ 68-89).

70.     To obtain a patent, an inventor must combine natural elements in a novel way that is different from simply finding that "natural phenomena" in the wild and then claiming it as her own.  Kistler Decl. ¶ 3, Ex. B. (Godici Decl. ¶¶ 19-26) (explaining the patentability of natural products).

71.     Hybrid plants result from human intervention intended to produce characteristics the plant would not otherwise have.  *Id.* (Godici Decl. ¶¶ 31-33); *see also* Kistler Decl. ¶ 2, Ex. A.  (McHughen Decl. ¶¶ 25-26, 128) (describing process for hybridization).

72.     Benbrook agrees that hybridization is "natural."  Kistler Decl. ¶ 4, Ex. C. (Benbrook Dep. 168:3-168:4) ("Q: Is hybridization a natural process? A: Yes.").

73.     Benbrook acknowledged in his deposition that the fact that something is patented does not mean it is "unnatural."  *Id.* (Benbrook Dep. 8:1-8:3; 125:24-126:1) ("Q: If a plant is patentable, does that necessarily make it unnatural? A: No.") ("Q: So the fact that this plant is patented doesn't make it unnatural, right? A: In and of itself, no.").

74.     The United States Patent and Trademark Office has explained that "Nature-Based Products" are patentable if they combine "naturally occurring" elements in a novel way.  Kistler Decl. ¶ 3, Ex. B. (Godici Decl. ¶¶19-26).

75.     An example from the USPTO is "naturally occurring" goat milk combined with a "naturally occurring" strain of bacteria to produce a new and more effective form of yogurt culture.  *Id.* ¶ 24; Kistler Decl. ¶ 15, Ex. N. ("Nature-Based Products" at 16-17).

76.     Another example from the USPTO is the combination of a "naturally occurring" juice with a "naturally occurring" preservative in a new way that extends the shelf life of that juice.  Kistler Decl. ¶ 3, Ex. B. (Godici Decl. ¶ 23); Kistler Decl. ¶ 15, Ex. N. ("Nature-Based Products" at 1-2).

77.     In July 2015 there were more than thirty patents issued for novel plant varieties. Kistler Decl. 3, Ex. B. (Godici Decl. ¶ 33).

78.     Benbrook himself is not "skilled in the art," having repeatedly disclaimed any expertise in patents and having likewise conceded that he is not a plant scientist. Kistler Decl. ¶ 4, Ex. C. (Benbrook Dep. 35:21-36:6; 39:13-39:18; 41:17-41:23; 42:1-42:17; 10:2-10:5).

79.     Inventors may obtain patents on "natural" materials and phenomena so long as some novel and inventive feature differentiates the patented natural product from the corresponding "wild" version.  Kistler Decl. ¶ 3, Ex. B. (Godici Decl. ¶¶19-26).

80.     Bioengineered crops (including corn) are produced through processes and techniques that replicate processes readily observed in nature.  Kistler Decl. ¶ 2, Ex. A. (McHughen Decl. ¶¶ 68-89, 98, 100-101, 113-114, 125-137).

81.     Bioengineered corn is produced through horizontal interspecific gene transfer— the non-sexual transfer of genetic material between two species.  *Id.* ¶ 76.

82.     This sort of transmittal of genetic material has been documented in nature: in crops, in plants, and in higher organisms including humans, and the relevant scientific literature bears this out.  *Id.*  ¶¶ 78-89.

83.     Bioengineered corn is a more precise and predictable form of plant breeding that,

like all plant breeding, involves extensive human intervention. *Id.* ¶¶ 108-137.

84.     General Mills' evidence demonstrates that: (1) based on a correct application of science, bioengineered corn is cultivated using processes that mirror those that occur in nature (Kistler Decl. ¶ 2, Ex. A. (McHughen Decl. ¶¶ 68-89, 98, 100-101, 113-114, 125-137)); (2) the FDA has determined there is no "material" difference between bioengineered corn and non-bioengineered corn, and no labeling distinctions need to be made between the two as a result (*Id.* ¶ 35); Kistler Decl. ¶ 12, Ex. K, at p. 7 (FDA. 2001. *DRAFT Guidance for Industry: Voluntary Labeling Indicating Whether Foods Have or Have Not Been Developed Using Bioengineering; Draft Guidance*, available at http://www.fda.gov/food/guidanceregulation/guidancedocumentsregulatoryinformation/labelingnutrition/ucm059098.htm (last visited Aug. 10, 2015)); (3) Kix consumers did not ascribe to the phrase "Made with All Natural Corn" the non-bioengineered meaning that Plaintiffs' counsel now proffers (*See* Statement of Undisputed Facts in Support of General Mills' Motion for Summary Judgment Under the First Amendment, Ostberg Survey, ¶¶ 35-40); (4) the named Plaintiffs themselves hold a wide variety of meanings for that term, as do other consumers (*Compare* Kistler Decl. ¶ 4, Ex. C. (Benbrook Dep. 63:9-63:14; 65:4-66:4; 72:6-75:2) *with* Kistler Decl. ¶ 6, Ex. E. (Marcus Dep. 110:11-110:15) *with* Kistler Decl. ¶ 7, Ex. F. (Zardeneta Dep. 50:2-50:12; 23:20-23:24) *with* Kistler Decl. ¶ 8, Ex. G. (Kellogg Dep. 119:2-119:3; 122:8-122:15) *with* Kistler Decl. ¶ 5, Ex. D. (Bevans Dep. 113:8-113:13) *with* Kistler Decl. ¶ 17, Ex. P. (Plaintiffs' Response to Interrogatory No. 9)); (5) the specific words in a patent are not considered by the USPTO, or by anyone skilled in the art, to connote anything about the "natural" or "non-natural" status of a particular patented invention (Kistler Decl. ¶ 3, Ex. B (Godici Decl. ¶¶ 15-18)); and (6) Plaintiffs' very own patent-based evidence repudiates their argument that "synthetic" connotes that patented article is not natural. *Id.* ¶¶ 27-30.

Dated this 14th day of August, 2015.

By: _/s/ Stephen M. Orlofsky_

**BLANK ROME LLP**
Stephen M. Orlofsky
David C. Kistler
New Jersey Resident Partners
301 Carnegie Center, 3rd Floor
Princeton, NJ  08540
Phone: 609-750-2646

**PERKINS COIE LLP**
David T. Biderman (*Admitted Pro Hac Vice*)
4 Embarcadero Center, Suite 2400
San Francisco, CA 94111
Phone: 415-344-7000
Fax: 415-344-7050

Charles C. Sipos (*Admitted Pro Hac Vice*)
1201 Third Avenue, Suite 4800
Seattle, WA  98101
Phone:  206-359-8000
Fax:  206-359-9000

*Attorneys for Defendant, General Mills, Inc.*