**LITE DEPALMA GREENBERG, LLC**
Bruce D. Greenberg, Esq.
570 Broad Street, Suite 1201
Newark, NJ  07102
Telephone:  973-623-3000 x3820
Facsimile:  973-877-3845

***Attorneys for Plaintiffs***
(Additional counsel listed on signature page)

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| IN RE GENERAL MILLS, INC. KIX CEREAL LITIGATION | **Case No. 2:12-cv-00249-KM-JBC** |

## DECLARATION OF HENRY J. KELSTON IN SUPPORT OF PLAINTIFFS' OPPOSITIONS TO DEFENDANT GENERAL MILLS, INC.'S MOTIONS TO STRIKE AND IN SUPPORT OF PLAINTIFFS' MOTION TO SEAL

I, Henry J. Kelston, hereby declare as follows:

1.     I am a partner with Milberg LLP, interim co-lead counsel for Plaintiffs in the above-captioned matter.  I make this Declaration in support of Plaintiffs' Opposition to Defendant General Mills Inc.'s Motion to Strike Portions of the Declaration of Henry Kelston and Motion to Strike the Declaration of Elizabeth Howlett.  I have personal knowledge of each of the facts set forth in this Declaration, and if called upon, I could and would competently testify thereto.

2.     Attached as Exhibit A is a true and correct copy of native Excel files produced by General Mills bates numbered GMI_KIX00099247-GMI_KIX00111609.

3.     Exhibit A contains proprietary sales and pricing data produced by General Mills from The Nielsen Company (US) LLC that has been designated as "Highly Confidential" pursuant to the operative Discovery Confidentiality Order, dated July 2, 2012 (Dkt. 40).

4.     On October 29, 2015, General Mills informed Plaintiffs that it would not oppose Plaintiffs' motion to seal Exhibit A.

5.     Attached as Exhibit B is a true and correct copy of excerpts from the deposition of Elizabeth Howlett, dated September 30, 2015.

6.      Attached as Exhibit C is a true and correct copy of General

Mills' Objections and Responses to Plaintiffs' First Request for Production

of Documents.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 30th day of October, 2015, in New York, New York.

_____
Henry J. Kelston

# EXHIBIT A

# FILED UNDER SEAL

# EXHIBIT B

1

1

2    UNITED STATES DISTRICT COURT
     DISTRICT OF NEW JERSEY
3    Case No. 2:12-cv-249-KM-JBC
     -------------------------------------X
4

5
         IN RE GENERAL MILLS INC.
6         KIX CEREAL LITIGATION

7

8    -------------------------------------X

9

10                      September 30, 2015

11                      9:53 a.m.

12

13

14        Videotaped Deposition of ELIZABETH

15    HOWLETT, Ph.D., held at the offices of

16    Perkins Coie, 30 Rockefeller Plaza,

17    New York, New York, pursuant to Notice,

18    before Wendy D. Boskind, a Registered

19    Professional Reporter and Notary Public

20    of the State of New York.

21

22

23

24

25

79

                    Howlett, Ph.D.

1

2    how did you come to learn about that

3    study?

4         A.    That was provided to me by

5    counsel.

6         Q.    I want to make sure I

7    understand your prior testimony, that,

8    for purposes of your work in the Kix

9    litigation, you had a pre-existing

10   knowledge of the Consumer Reports study;

11   is that right?

12        A.    Yes.

13        Q.    The Hartman studies you found

14   through internet-searching?

15        A.    Right, and I did have prior

16   knowledge of the Hartman studies, as

17   well.

18        Q.    Okay.  Did you do anything

19   else, beyond internet-searching, in order

20   to identify studies that might either

21   contradict or confirm the results of the

22   Ostberg Survey?

23        A.    Yes.

24        Q.    What did you do?

25        A.    I went through our library

80

1                    Howlett, Ph.D.

2    sources, we have different subscriptions

3    to different types of market research --

4         Q.    Mm-hmm.

5         A.    -- and I looked specifically

6    for information on -- in the food

7    category, and did not find any sources of

8    information through my library sources.

9         Q.    Can you recall the name of

10    the particular databases that were

11    searched for this market research?

12         A.    Mintel, I was looking for the

13    food -- if Mintel had done a food report

14    on natural and whether it discussed the

15    issue at hand, which was the

16    understanding of genetically and

17    modification, genetic modification within

18    the context of food, and I didn't find

19    any Mintel reports on that.  And then I

20    also looked through some of the Nielsen

21    information that I had, and none was

22    available.

23         Q.    The internet-searching that

24    you did independently -- because I had

25    understood you to have done some

```
1                    Howlett, Ph.D.

2       independent --

3            A.    Yes.

4            Q.    -- internet researching; is

5       that correct?

6            A.    Yes.

7            Q.    How did go about doing that?

8                  Were you looking on a --

9        well, how did you go about doing that?

10           A.    Just a typical search.

11                 I did it, actually, through

12      several ways.  One thing, I searched

13      under Google Scholar.  First of all, it

14      tends to focus more on the academic

15      literature.  Then I did a broader search

16      on the entire web document.  And then I

17      went into some of the subscription

18      services that the university has, which

19      is ABI Inform, which is the -- it's a

20      service that presents journals, and so

21      forth, that it's a subscription, so I

22      searched under Proquest and ABI Inform

23      for market research reports.

24           Q.    And what were the search

25       terms that you used in order to identify
```

82

                    Howlett, Ph.D.

1        potentially-- well, I'll use a lawyer

2        term -- potentially-relevant information.

3           A.    Well, I used a number of

4        them:  "natural with", and then I used

5        "natural", and I did it with a "and

6        consumer", and I did "all natural", and I

7        did "100 percent natural".  I did

8        "genetic", "GMO", "genetically-modified"

9        and "natural".  And I did -- so I did a

10       variety of combinations of search terms.

11          Q.    Limiting the work -- limiting

12        your answer to the work that you did in

13        connection with this litigation, how many

14        hours would you say you spent searching

15        for relevant market research or other

16        information in the course of preparing

17        your report?

18          A.    I don't -- I don't recall,

19       off the top of my head.

20          Q.    Do you have an estimate?

21          A.    Probably a half a day.

22          Q.    Were there reports or studies

23        that you identified in the course of this

24        research but then concluded were not

83

Howlett, Ph.D.

1        Howlett, Ph.D.

2    sufficiently related to your inquiry and

3    didn't use for that reason?

4        A.    No.

5        Q.    Is it fair to say, then,

6    that -- or, is it accurate to say -- I'm

7    just trying to get at what you looked

8    at -- is it accurate to say that Appendix

9    C represents the sum total of the studies

10   or reports that you actually identified

11   and reviewed for purposes of preparing

12   your report and there were no other

13   studies or reports that you reviewed and,

14   ultimately, discounted or elected not to

15   include?

16       A.    That statement's correct.

17       Q.    Dr. Howlett, my questions,

18   again, right now, are limited to the four

19   studies that you reviewed for purposes of

20   this lawsuit.

21            Am I correct in understanding

22   that you believe to have drawn a

23   conclusion about the reliability of those

24   four studies?

25       A.    Yes.

1                     Howlett, Ph.D.

2    reputation of the marketing and research

3    group, most reasonable marketers would

4    look at this information and say it's a

5    valid and reliable report.

6         Q.    And that's based on -- in

7     this case, it's based on the source of

8     the survey?

9              MR. KELSTON:   Objection,

10        misstates the testimony.

11        A.    It's based on the name of the

12   organization that funded the research,

13   it's based on the organization that

14   actually conducted the research, it's

15   based on the description of the

16   methodology that I provided in my

17   deposition.

18        Q.    In your report.

19        A.    In my report -- excuse me.

20        Q.    Dr. Howlett, in conducting a

21    consumer survey, is it helpful to know

22    what the consumer's pre-existing

23    knowledge is of the topics under

24    consideration in the survey itself?

25        A.    In some circumstances, yes.

95

```
 1                  Howlett, Ph.D.
 2      record, what this document is?
 3           A.    It's the summary of a
 4      research study commissioned by Consumer
 5      Reports, and the goal was to look at food
 6      labels.
 7           Q.    Dr. Howlett, you didn't
 8      participate in either the design,
 9      administration, or review for validity of
10      this study; did you?
11           A.    No.
12           Q.    And, other than what is
13      reflected in Exhibit 3 itself, do you
14      have any other information -- other
15      information extraneous to Exhibit 3, that
16      goes to the design, administration, or
17      validity of this study?
18           A.    Yes, I have prior knowledge
19      of the excellence of The Consumer Report
20      Company as an unbiased and professional
21      source of information.
22           Q.    Anything else, besides those
23      two things, the reputation of the
24      companies involved in the survey and the
25      document itself?
```

```
 1                    Howlett, Ph.D.

 2      report, and the portion of your report

 3      where you're -- and that's Exhibit 1, for

 4      clarity of the record -- and the portion

 5      of your report where you're discussing

 6      the Consumer Reports study.

 7                    So, Footnote 3 of your report

 8      contains some discussion of the survey

 9      population for the Consumer Reports

10      Survey.

11                    Do you see that?

12          A.    Yes.

13          Q.    Among the information that

14      you've called out here is the error

15      rate -- the potential margin of error --

16      excuse me --

17          A.    Yes.

18          Q.    -- in the Consumer Reports

19      Survey.

20                    Do you see that?

21          A.    Yes.

22          Q.    Did you do anything to

23      independently calculate or verify the

24      margin of error in the Consumer Reports

25      Survey?
```

                    Howlett, Ph.D.

1

2        A.    Yes, I did, actually.

3        Q.    What did you do?

4        A.    I -- there's an interesting

5    website, and you can go and plug in

6    numbers that looks at your confidence

7    level and your significance level, and

8    you can see -- you can see (indicating)

9    what those numbers would be.  So given

10   the number of -- the only information

11   that you need to do that is the

12   confidence level and the representative

13   sample, and you can get those numbers.

14   So, yes, I did that.

15       Q.    Can you explain to me exactly

16    how that calculation is done, that the

17    variables that are input into this tool

18    to produce the error rate?

19       A.    There is a formula, and it's

20   a very long formula, which is why this

21   website is terrific and, off the top of

22   my head, I cannot recall the exact

23   mathematical formula.

24            However, what it involves, it

25   is -- involves the number of subjects

154

                    Howlett, Ph.D.

1

2        A.    This is the Hartman 2012

3   report.

4        Q.    And is this among the reports

5    that you based your conclusions on in

6    your --

7        A.    Yes.

8        Q.    -- in your report?

9        A.    Yes.

10        Q.    Dr. Howlett, you didn't

11    participate in the design,

12    administration, or validation of the

13    results of this report; correct?

14        A.    Correct.

15        Q.    And your conclusions about

16    the validity of this report or study are

17    drawn entirely from what's contained in

18    the report itself; correct?

19        A.    And my knowledge of this

20   organization.

21        Q.    By "this organization", you

22    mean the Hartman Group?

23        A.    Yes.

24        Q.    Have you ever worked with the

25    Hartman Group in any capacity?

202

```
1              Howlett, Ph.D.

2         relied on in reaching her

3         conclusions that she reached in

4         this litigation, was marked for

5         identification, as of this date.)

6         Q.    Dr. Howlett, the court

7    reporter has handed you what's been

8    marked as I believe Exhibit 6 to your

9    report.

10             Dr. Howlett, is this the

11   fourth and final third-party study that

12   you relied on in reaching your

13   conclusions that you reached in this

14   litigation?

15        A.    Yes.

16        Q.    And you didn't participate in

17   the design, administration, or review of

18   the information collected in this study

19   for its validity?

20        A.    No.

21        Q.    Did you have any access to

22   the raw data that was collected in the

23   course of this study?

24        A.    No.

25        Q.    What's your familiarity with
```

203

                    Howlett, Ph.D.

1
2    Cogent Research?

3         A.    I actually hadn't heard of it

4    prior to this, so I went out and did a

5    little search on the internet and

6    gathered some information.

7         Q.    What information did you

8     gather?

9         A.    That it's a well-respected

10   marketing research firm.

11        Q.    How did you conclude it was

12    well-respected?

13        A.    Just looking at -- I don't

14   remember right off, but just looking at

15   they had a list of the clients who had

16   previously used (indicating) this

17   research organization, and I just made

18   the inference.

19        Q.    Have you ever worked with

20    Cogent Research yourself?

21        A.    No.

22        Q.    Other than this research that

23    you did into Cogent, and the document

24    that is Exhibit 6, do you have any other

25    information or evidence upon which you're

204

1                   Howlett, Ph.D.

2      basing your conclusions about the

3      validity or reliability of this survey?

4           A.    No.

5           Q.    Dr. Howlett, turn, if you

6      would, to page 4 of Exhibit 6.

7                 Based on the information

8      that's presented on page 4, what was the

9      total sample size of -- for the survey

10     that Cogent Research conducted?

11          A.    39.

12          Q.    And how many people actually

13     participated in the study?

14          A.    33.

15          Q.    What do you know about the

16     geographic dispersion of those 33

17     individuals?

18          A.    It's my understanding that,

19     because it was an online bulletin board

20     and it was also a national sample, that

21     it was -- it wasn't limited to one area.

22          Q.    Do you know if that -- if

23     that 33-person sample size was

24     representative of the United States

25     population?

223

Howlett, Ph.D.

1

2    your opinion about whether these are

3    valid and reliable surveys that conflict

4    with the result of the Ostberg Survey?

5              MR. SIPOS:   Object to the

6         form.

7         A.    No.

8         Q.    Okay, and why not?

9         A.    Because, again, this is --

10   these are the common techniques and

11   procedures that are used in the marketing

12   research industry to address these types

13   of questions.

14        Q.    And, when you say these kinds

15    of questions, what do you mean?

16        A.    The consumer's conceptual

17   understanding of what "natural" means.

18        Q.    Is it your belief that the

19    surveys on which you rely in your

20    declaration comply with standard

21    practices in the marketing industry for

22    the conduct of consumer opinion surveys?

23        A.    Yes.

24        Q.    And, first, why do you

25    believe that is true?

224

                    Howlett, Ph.D.

1

2      A.    Given my understanding of how

3  these kinds of surveys are conducted, and

4  as a marketing research professor who's

5  looked at a lot of these surveys, these

6  are the types of procedures that are

7  used.

8            And, also, it's coming from

9  highly-respected sources of information.

10  These organizations are highly-respected,

11  and you expect them to follow a certain

12  set of guidelines for doing this kind of

13  research.

14      Q.    Do -- well, let me strike

15   that.

16            Mr. Sipos asked earlier today

17   whether the methodological data that you

18   reviewed in connection with the surveys

19   that you opine on in your report include

20   any information about the amount of time

21   that survey participants had to respond

22   to specific questions.

23            Do you recall that?

24      A.    Yes.

25      Q.    And you said that you did not

```
 1                 Howlett, Ph.D.
 2    experimental type of study, and that's
 3    why it applied in an experimental type of
 4    study as opposed to just a standard
 5    opinion research, like was done in these
 6    cases.
 7         Q.    And why did -- and, in fact,
 8     I believe Mr. Sipos asked you specifically
 9    about whether there was information about
10    the amount of time for which participants
11    were presented with a stimulus.
12              Do you remember him asking
13    that?
14         A.    Yes.
15         Q.    Okay.  And why is that
16     information not pertinent to the Consumer
17     Reports and Hartman surveys?
18         A.    Because it wasn't a stimulus-
19    based -- we -- there was no presentation
20    of stimuli, it wasn't -- it was an
21    opinion survey, not an experimental test.
22         Q.    You were also asked earlier
23     today whether the methodological data you
24     had included for the Consumer Reports
25     Survey, the amount of time that the
```

231

Howlett, Ph.D.

1

2      Q.    Are you familiar with the

3   phrase "secondary data"?

4      A.    Yes.

5      Q.    What is "secondary data"?

6      A.    "Secondary data" is actually

7   data that is collected not specifically

8   for your research project.  So it's -- it

9   exists, that it's been collected by

10  another agency or organization.

11     Q.    And do you, in the course of

12   your academic work, review and rely on

13   secondary data?

14     A.    Yes.

15     Q.    For a market research expert

16   to conclude that secondary data is valid

17   and reliable, does a marketing expert

18   need to have the underlying raw data

19   of -- from the -- from a survey being

20   reviewed as secondary data?

21     A.    No.

22          MR. SIPOS:  Object to the

23     form.

24     Q.    Why not?

25     A.    Because, again, that's

```
 1                    Howlett, Ph.D.

 2     just -- it's not standard practice in the

 3     industry, of when you have a report

 4     that's prepared by an organization, like

 5     IRI or Nielsen or Hartman, you're putting

 6     your trust in the reputation of the

 7     company that they're going to be

 8     following these standard practices, and

 9     you never get raw data.

10          Q.    And is it your opinion that

11      it is reasonable to rely on secondary

12      data from reputable organizations, such

13      as you just mentioned, even without

14      having the opportunity to review the

15      underlying raw data?

16               MR. SIPOS:  Object to the

17          form.

18          A.    Yes.

19          Q.    When you are considering a

20      survey that's been done that is secondary

21      data for you, does the purpose for which

22      the survey was conducted come into play

23      in your evaluation of the reliability of

24      the survey?

25          A.    Yes.
```

233

1                    Howlett, Ph.D.

2         Q.    And how does the purpose for

3     which it was conducted affect your

4     evaluation of reliability?

5         A.    Well, for example, in --

6     there are some surveys that the USDA will

7     put together or the CDC, and they are --

8     I use those a lot to look at, because

9     they are totally objective.

10               The other marketing research

11    firms, again, are just -- they're

12    collected for the industry as a whole,

13    not for a specific firm and so, again,

14    they're very objective, and that's -- you

15    know, that's the key of what I look for

16    and that is that the total objectivity

17    that you can get from the whole industry

18    or from the government or any sources

19    like that.

20         Q.    And are there purposes for

21    which surveys are conducted that you

22    would consider to make them inherently

23    less reliable than the kinds of surveys

24    you just described?

25               MR. SIPOS:  Object to the

234

```
1              Howlett, Ph.D.
2         form of the question.
3         A.    Well, given my experience,
4    I'd have to say that surveys conducted
5    for litigation are going to be somewhat
6    less reliable just in general than an
7    unbiased entity.
8         Q.    So, when you were evaluating
9     the Consumer Reports and Hartman surveys
10    and the IFIC Survey on which you opined
11    in your declaration in this case, did you
12    take into account the purpose for which
13    they were conducted?
14        A.    Yes.
15        Q.    And were those surveys
16    conducted for litigation, to your
17    knowledge?
18        A.    No, they were not.
19        Q.    Can you please take a look at
20    Exhibit 3, which is the Consumer Reports
21    National Research Center survey research
22    report.  And, if you would, please turn
23    to page 19.  And, toward the bottom of
24    the page, there's a grid that has
25    question 8.
```

253

1                     Howlett, Ph.D.

2      opine on in your report, are valid and

3      reliable studies on which marketing

4      experts would reasonably rely in forming

5      an opinion on the subject of consumer

6      perception of food labels?

7                     MR. SIPOS:  Object to the

8            form of the question.

9            A.    No.

10           Q.    Okay, why not?

11           A.    Because, as I've said,

12     these -- the sources of information, this

13     market research information, is highly

14     reliable, if it's done well, and I think

15     it's very valid and reliable, and it

16     addresses the general conception of how

17     people in general view "natural" within

18     the context of food products.  And

19     there's no indication that maybe people

20     in a higher or a lower socioeconomic

21     status, for example, would consider those

22     terms to be different.  There's no

23     indication that that would be the case.

24           Q.    The Ostberg Survey purports

25       to show that only approximately 2 percent

254

1                  Howlett, Ph.D.

2    of consumers make any association between

3    the statement:  Made with all natural

4    corn, on Kix packaging, and whether that

5    corn is bioengineered or organic.

6                  Does the degree of difference

7    between the result that the Ostberg

8    Survey presents and the results that the

9    Consumer Reports and Hartman surveys

10   present affect your judgment at all about

11   whether there is valid and reliable

12   evidence existing that contradicts the

13   Ostberg Survey?

14              MR. SIPOS:  Object to the

15         form of the question.

16         A.    I think it's clear.  And

17   I -- I've said this before, again, that I

18   think the Ostberg Survey is so far out of

19   the ballpark, and all these other sources

20   of objective independent information are

21   all relatively consistent, and that's

22   what I'm basing my judgment on, on that

23   information.

24         Q.    The declaration that you

25    prepared for this case, it's been marked

# EXHIBIT C

**PERKINS COIE LLP**
David T. Biderman (*Admitted Pro Hac Vice*)
4 Embarcadero Center, Suite 2400
San Francisco, CA 94111
Phone: 415-344-7000
Fax: 415-344-7050

Kathleen M. O'Sullivan (*Admitted Pro Hac Vice*)
Joseph M. McMillan (*Admitted Pro Hac Vice*)
Charles C. Sipos (*Admitted Pro Hac Vice*)
1201 Third Avenue, Suite 4800
Seattle, WA  98101
Phone:  206-359-8000
Fax:  206-359-9000

**BLANK ROME LLP**
Stephen M. Orlofsky
David C. Kistler
301 Carnegie Center, 3rd Floor
Princeton, NJ  08540
Phone:  609-750-2646
Fax:  609-897-7286

**O'MELVENY & MYERS LLP**
Jeffrey J. Fowler (*Admitted Pro Hac Vice*)
400 S. Hope Street
Los Angeles, CA 90071
Telephone: (213) 430-6000
Facsimile: (213) 430-6407
E-mail: jfowler@omm.com

Attorneys for
GENERAL MILLS, INC.

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| CHRISTINA BEVANS, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br>v.<br><br>GENERAL MILLS, INC.,<br><br>Defendant. | Case No. 2:12-cv-00249 (FSH) (PS)<br>Case No. 2:12-cv-02886 (FSH) (PS)<br><br>**GENERAL MILLS' OBJECTIONS AND RESPONSES TO PLAINTIFF'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS** |

ROBIN MARCUS, on behalf of herself and all others similarly situated,

Plaintiff,

v.

GENERAL MILLS, INC.,

Defendant.

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, General Mills sets forth below its responses and objections to Plaintiff's First Requests for Production of Documents.

## PRELIMINARY STATEMENT

General Mills intends to limit the burden associated with electronic discovery by collecting and reviewing the files of a pre-determined set of custodians and central files. It also plans to filter the ESI it collects by applying a set of keywords. General Mills will cooperate with Plaintiff through periodic meet and confer discussions where the parties can discuss the particular custodians, sources and keywords. Like any endeavor to collect, review and produce electronically stored information, however, producing from multiple custodial and non-custodial sources will impose significant burden and expense. To the extent that Plaintiffs believe these Requests require more than the sources General Mills plans to collect, General Mills objects on the grounds that (a) the requests seek to compel General Mills to conduct a search beyond the scope permissible discovery contemplated by the Federal Rules Civil Procedure and (b) compliance with the requests would impose an undue burden and expense on General Mills. Fed. R. Civ. P. 26(b)(2)(C)(iii).

General Mills' responses and objections are made in good faith, based on presently available information and documentation. Plaintiffs should not construe these responses and objections to prejudice General Mills right to conduct further investigation or to limit General

Mills' right to utilize any additional evidence that may be developed.  General Mills does not waive any right to modify and/or supplement its responses and objections to any document request, and expressly reserves all such rights.

General Mills intends for these responses to apply to all three cases—*Bevans, Marcus,* and *Pfieffer*.  It has not included *Pfieffer* in the caption because the Court has not yet agreed to consolidate the case.

## <u>GENERAL OBJECTIONS</u>

General Mills makes Specific Objections to each separate Request in its responses below.  General Mills also makes the following General Objections and incorporates them by reference to avoid the wasteful exercise of repeating the same objections for each Request.

1.      General Mills does not in any way adopt Plaintiff's purported definitions of words and phrases and reserves the right to object to them to the extent they are inconsistent with either (i) the definitions set forth by General Mills where applicable or (ii) the Federal Rules of Civil Procedure, or (iii) the ordinary and customary meaning of such words and phrases.  Likewise, General Mills objects to Plaintiff's purported definitions to the extent that they purport to impose upon General Mills any obligations broader than, or inconsistent with, the Federal Rules of Civil Procedure or common law.

2.      General Mills objects to the extent that any Request seeks documents relating to products other than Kix (original), Berry Berry Kix, and Honey Kix, on the grounds that all other General Mills products are irrelevant and outside the scope of this litigation.

3.      General Mills does not in any way adopt Plaintiff's Instructions, and specifically objects to Instructions 1 through 14 on the grounds that the obligations imposed are antiquated, impractical, burdensome, and exceed the obligations of the Federal Rules of Civil Procedure 26 and 34.  General Mills also objects to Instruction 15 on the same grounds; however, subject to and without waiving the objection, General Mills agrees to follow the general prescriptions set forth in Appendix "A" to the extent they are technically feasible.

4.      General Mills objects to the Requests to the extent that they seek documents outside the alleged class period, which is from May 3, 2006 to the present.

5.      General Mills objects to the Requests to the extent that they seek information protected by the attorney-client privilege or work product doctrine.  Nothing contained in these responses is intended as a waiver of any attorney-client privilege, work product protection, or any other applicable privilege or doctrine.

6.      General Mills objects to the Requests to the extent that the burden of responding outweighs the benefit, or to the extent that they seek the production of documents that are not reasonably accessible as defined by Federal Rule of Civil Procedure 26(b)(2)(B).

7.      General Mills objects to the Requests to the extent they purport to require General Mills to produce public documents that are equally available to Plaintiff.

8.      General Mills objects to the Requests to the extent they seek the production of confidential or proprietary documents except in accordance with the Confidentiality Order that the Court has approved in this action.

9.      General Mills does not concede that any of the documents they will produce are or will be admissible evidence at trial or any evidentiary hearing.  Further, General Mills does not waive any objection, whether or not asserted herein, to the use of any such answer or documents at trial.

**SPECIFIC RESPONSES AND OBJECTIONS**

<u>REQUEST FOR PRODUCTION NO. 1:</u>

Copies of all package labeling used for the Products from January 1, 2006, to the present.

<u>RESPONSE TO REQUEST FOR PRODUCTION NO. 1:</u>

Subject to and without waiving the General Objections stated above, General Mills has already produced package flats for Kix (original) and agrees to produce package flats for Berry Berry Kix and Honey Kix.

REQUEST FOR PRODUCTION NO. 2:

Documents sufficient to identify the time period during which, and geographic area where, each package label produced in response to Request for Production No. 1 was or is used.

RESPONSE TO REQUEST FOR PRODUCTION NO. 2:

In addition to the General Objections stated above, General Mills objects to the extent that this Request is intended to require General Mills to create documents, or gather data, that do not exist.  Subject to and without waiving the General and Specific Objections stated above, General Mills will attempt to locate non-privileged documents sufficient to identify the information requested, if any exist.

REQUEST FOR PRODUCTION NO. 3:

Copies of all versions and drafts of package labeling considered by You for use in the sale of the Products, whether or not ultimately utilized in the Marketing Material for the Products.

RESPONSE TO REQUEST FOR PRODUCTION NO. 3:

In addition to the General Objections stated above, General Mills objects to the phrase "for use in the sale of the Products" on the grounds that it is overbroad, vague, and ambiguous.  General Mills also objects to this Request to the extent that it seeks "all versions and drafts" on the grounds that it is overbroad, unduly burdensome, vague, and ambiguous.

Subject to and without waiving the General and Specific Objections stated above, General Mills will produce responsive, non-privileged documents from central files that it maintains for Kix labels.  General Mills will also produce any non-privileged documents responsive to this Request from the files of designated document custodians, after a reasonably diligent search of their files by applying an agreed-upon keyword search filter and reviewing the results.

REQUEST FOR PRODUCTION NO. 4:

All Documents concerning Defendant's decision(s) to place the statement "made with All Natural Corn" or the phrase "All Natural" on the packaging of the Products, any Marketing Material, and/or Your Website

<u>RESPONSE TO REQUEST FOR PRODUCTION NO. 4:</u>

In addition to the General Objections stated above, General Mills objects to this Request to the extent it seeks "all Documents concerning" on the grounds it is overbroad, unduly burdensome, vague, and ambiguous.

Subject to and without waiving the General and Specific Objections stated above, General Mills will produce any non-privileged documents responsive to this Request from the files of the designated document custodians, after a reasonably diligent search of their files by applying an agreed-upon keyword search filter and reviewing the results.

<u>REQUEST FOR PRODUCTION NO. 5:</u>

All Documents concerning correspondence among Your employees or between You and any third party regarding the terms "natural," "All Natural," "made with All Natural Corn," or any variations thereof.

<u>RESPONSE TO REQUEST FOR PRODUCTION NO. 5:</u>

In addition to the General Objections stated above, General Mills objects to the phrases "all Documents concerning correspondence," "any third party," and "any variations" on the grounds that they are overbroad, unduly burdensome, vague, and ambiguous.

Subject to and without waiving the General and Specific Objections stated above, General Mills will produce any non-privileged documents responsive to this Request from the files of the designated document custodians, after a reasonably diligent search of their files by applying an agreed-upon keyword search filter and reviewing the results.

<u>REQUEST FOR PRODUCTION NO. 6:</u>

All Documents concerning Defendant's reason(s) or the basis for placing the statement "made with All Natural Corn" or the phrase "All Natural" on the packaging of the Products, any Marketing Material, and/or Your Website.

RESPONSE TO REQUEST FOR PRODUCTION NO. 6:

In addition to the General Objections stated above, General Mills objects to this Request to the extent it seeks "all Documents concerning" on the grounds that it is overbroad, unduly burdensome, vague, and ambiguous.

Subject to and without waiving the General and Specific Objections stated above, General Mills will produce any non-privileged documents responsive to this Request from the files of the designated document custodians, after a reasonably diligent search of their files by applying an agreed-upon keyword search filter and reviewing the results.

REQUEST FOR PRODUCTION NO. 7:

All documents concerning any anticipated or actual benefits derived or to be derived from the placement of the statement "made with All Natural Corn" or the phrase "All Natural" on the Products, any Marketing Material, and/or Your Website.

RESPONSE TO REQUEST FOR PRODUCTION NO. 7:

In addition to the General Objections stated above, General Mills objects to this Request to the extent it seeks "all Documents concerning" on the grounds it is overbroad, unduly burdensome, vague, and ambiguous.

Subject to and without waiving the General and Specific Objections stated above, General Mills will produce any non-privileged documents responsive to this Request from the files of designated document custodians, after a reasonably diligent search of their files by applying an agreed-upon keyword search filter and reviewing the results.

REQUEST FOR PRODUCTION NO. 8:

All Documents concerning consumer understanding of or response to the statement "made with All Natural Corn" or the phrase "All Natural," including, but not limited to, consumer surveys, whether prepared by You, on your behalf or by third parties.

RESPONSE TO REQUEST FOR PRODUCTION NO. 8:

In addition to the General Objections stated above, General Mills objects to this Request to the extent it seeks "all Documents concerning" on the grounds it is overbroad, unduly burdensome, vague, and ambiguous.

Subject to and without waiving the General and Specific Objections stated above, General Mills will produce any non-privileged documents responsive to this Request from the files of designated document custodians, after a reasonably diligent search of their files by applying an agreed-upon keyword search filter and reviewing the results.

REQUEST FOR PRODUCTION NO. 9:

All Documents concerning any consumer complaints or confusion regarding the statement "made with All Natural Com" and/or the phrase "All Natural."

RESPONSE TO REQUEST FOR PRODUCTION NO. 9:

In addition to the General Objections stated above, General Mills objects to this Request to the extent it seeks "all Documents concerning" on the grounds it is overbroad, unduly burdensome, vague, and ambiguous.

Subject to and without waiving the General and Specific Objections stated above, General Mills will search relevant discrete, non-custodian sources and produce any non-privileged customer complaints responsive to this Request. Additionally, General Mills will produce any non-privileged documents responsive to this Request from the files of designated document custodians, after a reasonably diligent search of their files by applying an agreed-upon keyword search filter and reviewing the results.

REQUEST FOR PRODUCTION NO. 10:

All Documents concerning any marketing study or analysis either: (a) with respect to use of the term "natural," or (b) with respect to genetically modified foods or ingredients.

RESPONSE TO REQUEST FOR PRODUCTION NO. 10:

In addition to the General Objections stated above, General Mills objects to this Request to the extent it seeks "all Documents concerning" on the grounds it is overbroad, unduly burdensome, vague, and ambiguous.

Subject to and without waiving the General and Specific Objections stated above, General Mills will produce any non-privileged documents responsive to this Request from the files of designated document custodians, after a reasonably diligent search of their files by applying an agreed-upon keyword search filter and reviewing the results.

REQUEST FOR PRODUCTION NO. 11:

All Documents concerning Defendant's decision(s) to place the statement "Made with simple, good-for-you ingredients like all-natural whole grain corn, KIX® cereal is a tasty way to kick off a great day" on the packaging of the Products, any Marketing Material, and/or Your Website.

RESPONSE TO REQUEST FOR PRODUCTION NO. 11:

In addition to the General Objections stated above, General Mills objects to this Request to the extent it seeks "all Documents concerning" on the grounds it is overbroad, unduly burdensome, vague, and ambiguous.

Subject to and without waiving the General and Specific Objections stated above, General Mills will produce any non-privileged documents responsive to this Request from the files of designated document custodians, after a reasonably diligent search of their files by applying an agreed-upon keyword search filter and reviewing the results.

REQUEST FOR PRODUCTION NO. 12:

All Documents concerning the statement "Made with simple, good-for-you ingredients like all-natural whole grain corn, KIX® cereal is a tasty way to kick off a great day" or any variation of this statement that You considered using in the Marketing Material for the Products or that was proposed to You to be used in the Marketing Material for the Products by any third party.

RESPONSE TO REQUEST FOR PRODUCTION NO. 12:

In addition to the General Objections stated above, General Mills objects to the phrases "all Documents concerning," "any variation," and "any third party" on the grounds that they are overbroad, unduly burdensome, vague, and ambiguous.

Subject to and without waiving the General and Specific Objections stated above, General Mills will produce any non-privileged documents responsive to this Request from the files of designated document custodians, after a reasonably diligent search of their files by applying an agreed-upon keyword search filter and reviewing the results.

REQUEST FOR PRODUCTION NO. 13:

All Documents concerning Defendant's reason(s) or the basis for placing the phrase "Made with simple, good-for-you ingredients like all-natural whole grain corn, KIX® cereal is a tasty way to kick off a great day" on the packaging of the Products, any Marketing Material, and/or Your Website.

RESPONSE TO REQUEST FOR PRODUCTION NO. 13:

In addition to the General Objections stated above, General Mills objects to this Request to the extent it seeks "all Documents concerning" on the grounds it is overbroad, unduly burdensome, vague, and ambiguous.

Subject to and without waiving the General and Specific Objections stated above, General Mills will produce any non-privileged documents responsive to this Request from the files of designated document custodians, after a reasonably diligent search of their files by applying an agreed-upon keyword search filter and reviewing the results.

REQUEST FOR PRODUCTION NO. 14:

All Documents concerning any anticipated or actual benefits derived or to be derived from the placement of the statement "Made with simple, good-for-you ingredients like all-natural whole grain corn, KIX® cereal is a tasty way to kick off a great day" on the Products, any Marketing Material, and/or Your Website.

<u>RESPONSE TO REQUEST FOR PRODUCTION NO. 14:</u>

In addition to the General Objections stated above, General Mills objects to this Request to the extent it seeks "all Documents concerning" on the grounds it is overbroad, unduly burdensome, vague, and ambiguous.

Subject to and without waiving the General and Specific Objections stated above, General Mills will produce any non-privileged documents responsive to this Request from the files of designated document custodians, after a reasonably diligent search of their files by applying an agreed-upon keyword search filter and reviewing the results.

<u>REQUEST FOR PRODUCTION NO. 15:</u>

All Documents concerning consumer understanding of or response to the phrase "Made with simple, good-for-you ingredients like all-natural whole grain corn, KIX® cereal is a tasty way to kick off a great day," including, but not limited to, consumer surveys, whether prepared by You, on your behalf or by third parties.

<u>RESPONSE TO REQUEST FOR PRODUCTION NO. 15:</u>

In addition to the General Objections stated above, General Mills objects to this Request to the extent it seeks "all Documents concerning" on the grounds it is overbroad, unduly burdensome, vague, and ambiguous.

Subject to and without waiving the General and Specific Objections stated above, General Mills will produce any non-privileged documents responsive to this Request from the files of designated document custodians, after a reasonably diligent search of their files by applying an agreed-upon keyword search filter and reviewing the results.

<u>REQUEST FOR PRODUCTION NO. 16:</u>

All Documents concerning any consumer complaints or confusion regarding the Statement "Made with simple, good-for-you ingredients like all-natural whole grain corn, KIX® cereal is a tasty way to kick off a great day."

RESPONSE TO REQUEST FOR PRODUCTION NO. 16:

In addition to the General Objections stated above, General Mills objects to this Request to the extent it seeks "all Documents concerning" on the grounds it is overbroad, unduly burdensome, vague, and ambiguous.

Subject to and without waiving the General and Specific Objections stated above, General Mills will produce any non-privileged documents responsive to this Request from the files of designated document custodians, after a reasonably diligent search of their files by applying an agreed-upon keyword search filter and reviewing the results.

REQUEST FOR PRODUCTION NO. 17:

All Documents concerning the Defendant's decision to use the image of cereal made in the shape of corn on the packaging of the Products, any Marketing Material, and/or Your Website and/or the reasons for that decision.

RESPONSE TO REQUEST FOR PRODUCTION NO. 17:

In addition to the General Objections stated above, General Mills objects to this Request to the extent it seeks "all Documents concerning" on the grounds it is overbroad, unduly burdensome, vague, and ambiguous.

Subject to and without waiving the General and Specific Objections stated above, General Mills will produce any non-privileged documents responsive to this Request from the files of designated document custodians, after a reasonably diligent search of their files by applying an agreed-upon keyword search filter and reviewing the results.

REQUEST FOR PRODUCTION NO. 18:

All Documents concerning the presence or absence of GMOs in the Products, including, but not limited to, all Documents concerning any testing revealing the presence or absence of GMOs in the Products.

RESPONSE TO REQUEST FOR PRODUCTION NO. 18:

In addition to the General Objections stated above, General Mills objects to this Request to the extent it seeks "all Documents concerning" on the grounds it is overbroad, unduly burdensome, vague, and ambiguous.

Subject to and without waiving the General and Specific Objections stated above, General Mills will produce any non-privileged documents responsive to this Request from the files of designated document custodians, after a reasonably diligent search of their files by applying an agreed-upon keyword search filter and reviewing the results.

REQUEST FOR PRODUCTION NO. 19:

All Documents concerning any communication with any Person from whom you purchased corn for use in the Products from January 1, 2006, to the present, which concern or in any way refer to GMOs.

RESPONSE TO REQUEST FOR PRODUCTION NO. 19:

In addition to the General Objections stated above, General Mills objects to this Request to the extent it seeks "all Documents concerning"  and "any communication" on the grounds it is overbroad, unduly burdensome, vague, and ambiguous.

Subject to and without waiving the General and Specific Objections stated above, General Mills will produce any non-privileged documents responsive to this Request from the files of designated document custodians, after a reasonably diligent search of their files by applying an agreed-upon keyword search filter and reviewing the results.

REQUEST FOR PRODUCTION NO. 20:

Documents sufficient to identify all suppliers of corn used to make the Products at any time from January 1, 2006, until the present.

RESPONSE TO REQUEST FOR PRODUCTION NO. 20:

In addition to the General Objections stated above, General Mills objects to the phrase "Documents sufficient to identify" on the grounds that it is overbroad, vague, and ambiguous.

Subject to and without waiving the General and Specific Objections stated above, General Mills will produce any non-privileged documents responsive to this Request from the files of designated document custodians, after a reasonably diligent search of their files by applying an agreed-upon keyword search filter and reviewing the results.

REQUEST FOR PRODUCTION NO. 21:

All Documents concerning consumer understanding or opinion of GMOs or the use of GMOs in food products, including, but not limited to, consumer surveys, whether prepared by You, on your behalf, or by third parties.

RESPONSE TO REQUEST FOR PRODUCTION NO. 21:

In addition to the General Objections stated above, General Mills objects to this Request to the extent it seeks "all Documents concerning" on the grounds it is overbroad, unduly burdensome, vague, and ambiguous.

Subject to and without waiving the General and Specific Objections stated above, General Mills will produce any non-privileged documents responsive to this Request from the files of designated document custodians, after a reasonably diligent search of their files by applying an agreed-upon keyword search filter and reviewing the results.

REQUEST FOR PRODUCTION NO. 22:

All Documents concerning any communication to and from any health organizations or governmental agencies concerning the presence of GMOs in the Products.

RESPONSE TO REQUEST FOR PRODUCTION NO. 22:

In addition to the General Objections stated above, General Mills objects to this Request to the extent it seeks "all Documents concerning" on the grounds it is overbroad, unduly burdensome, vague, and ambiguous.

Subject to and without waiving the General and Specific Objections stated above, General Mills will produce any non-privileged documents responsive to this Request from the files of designated document custodians, after a reasonably diligent search of their files by applying an agreed-upon keyword search filter and reviewing the results.

REQUEST FOR PRODUCTION NO. 23:

Documents sufficient to identify the monthly unit sales volume, gross sales amount, net sales amount, revenues, profits, and losses relating to the Products in the United States from January 1, 2006, to the present.

RESPONSE TO REQUEST FOR PRODUCTION NO. 23:

In addition to the General Objections stated above, General Mills objects to the extent that this Request is intended to require General Mills to create documents, or gather data, that do not exist.  Subject to and without waiving the General and Specific Objections stated above, General Mills will attempt to locate non-privileged documents sufficient to identify the information requested, if any exist.

REQUEST FOR PRODUCTION NO. 24:

Documents sufficient to identify the monthly unit sales volume, gross sales amount, net sales amount, revenues, profits, and losses relating to the Products in New Jersey from January 1, 2006, to the present.

RESPONSE TO REQUEST FOR PRODUCTION NO. 24:In addition to the General Objections stated above, General Mills objects to the extent that this Request is intended to require General Mills to create documents, or gather data, that do not exist.  Subject to and without waiving the General and Specific Objections stated above, General Mills will attempt to locate non-privileged documents sufficient to identify the information requested, if any exist.

REQUEST FOR PRODUCTION NO. 25:

Documents sufficient to identify the monthly unit sales volume, gross sales amount, net sales amount, revenues, profits, and losses relating to the Products in California from January 1, 2006, to the present.

RESPONSE TO REQUEST FOR PRODUCTION NO. 25:In addition to the General Objections stated above, General Mills objects to the extent that this Request is intended to require General Mills to create documents, or gather data, that do not exist.  Subject to and without waiving

the General and Specific Objections stated above, General Mills will attempt to locate non-privileged documents sufficient to identify the information requested, if any exist.

REQUEST FOR PRODUCTION NO. 26:

All Documents concerning the cost, pricing, and sales of the Products in the United States during the period January 1, 2006, to the present, including, but not limited to, any relative, comparative, or strategic analysis, assessment, evaluation, or other study or inquiry regarding the cost, pricing, or sales of the Products.

RESPONSE TO REQUEST FOR PRODUCTION NO. 26:

In addition to the General Objections stated above, General Mills objects to the phrase "all Documents concerning" on the grounds that it is overbroad, unduly burdensome, vague, and ambiguous.  General Mills also objects to the extent that this Request is intended to require General Mills to create documents, or gather data, that do not exist.  Subject to and without waiving the General and Specific Objections stated above, General Mills will attempt to locate non-privileged documents sufficient to identify the information requested, if any exist.

REQUEST FOR PRODUCTION NO. 27:

All Documents concerning the cost, pricing, and sales of the Products in New Jersey during the period January 1, 2006, to the present, including, but not limited to, any relative, comparative, or strategic analysis, assessment, evaluation, or other study or inquiry regarding the cost, pricing, or sales of the Products.

RESPONSE TO REQUEST FOR PRODUCTION NO. 27:

In addition to the General Objections stated above, General Mills objects to the phrase "all Documents concerning" on the grounds that it is overbroad, unduly burdensome, vague, and ambiguous.  General Mills also objects to the extent that this Request is intended to require General Mills to create documents, or gather data, that do not exist.  Subject to and without waiving the General and Specific Objections stated above, General Mills will attempt to locate non-privileged documents sufficient to identify the information requested, if any exist.

REQUEST FOR PRODUCTION NO. 28:

All Documents concerning the cost, pricing, and sales of the Products in California during the period January 1, 2006, to the present including, but not limited to, any relative, comparative, or strategic analysis, assessment, evaluation, or other study or inquiry regarding the cost, pricing, or sales of the Products.

RESPONSE TO REQUEST FOR PRODUCTION NO. 28:

In addition to the General Objections stated above, General Mills objects to the phrases "all Documents concerning," and "any relative, comparative, or strategic analysis, assessment, evaluation, or other study or inquiry" on the grounds that they are overbroad, unduly burdensome vague, and ambiguous. In addition to the General Objections stated above, General Mills objects to the extent that this Request is intended to require General Mills to create documents, or gather data, that do not exist.

Subject to and without waiving the General and Specific Objections stated above, General Mills will attempt to locate non-privileged documents sufficient to identify the information requested, if any exist.

REQUEST FOR PRODUCTION NO. 29:

Documents identifying Customers in the United States who purchased the Products from January 1, 2006, to the present.

RESPONSE TO REQUEST FOR PRODUCTION NO. 29:

Subject to and without waiving the General Objections stated above, General Mills states on information and belief that it does not, in the ordinary course of business, maintain documents responsive to this Request.

REQUEST FOR PRODUCTION NO. 30:

Documents identifying Customers in the state of New Jersey who purchased the Products from January 1, 2006, to the present.

RESPONSE TO REQUEST FOR PRODUCTION NO. 30:

Subject to and without waiving the General and Objections stated above, General Mills states on information and belief that it does not, in the ordinary course of business, maintain documents responsive to this Request.

REQUEST FOR PRODUCTION NO. 31:

Documents identifying Customers in the state of California who purchased the Products from January 1, 2006, to the present.

RESPONSE TO REQUEST FOR PRODUCTION NO. 31:

Subject to and without waiving the General Objections stated above, General Mills states on information and belief that it does not, in the ordinary course of business, maintain documents responsive to this Request.

REQUEST FOR PRODUCTION NO. 32:

Organizational charts identifying any of Defendant's employees involved in the marketing of the Products from January 1, 2006, to the present, including, but not limited to, any employees involved in the decision-making processes that resulted in Defendant's decisions to place the statement "made with All Natural Corn" or the phrase "All Natural" or the statement "Made with simple, good-for-you ingredients like all-natural whole grain corn, KIX® cereal is a tasty way to kick off a great day," on the packaging of the Products, any Marketing Material, and/or Your Website.

RESPONSE TO REQUEST FOR PRODUCTION NO. 32:

In addition to the General Objections stated above, General Mills objects to the extent that Plaintiffs seek organization charts unrelated to personnel involved in the marketing and branding of Kix cereals on the grounds that it is overbroad, unduly burdensome, vague, and ambiguous.

Subject to and without waiving the General and Specific Objections stated above, General Mills will produce unprivileged exemplars of organizational charts responsive to this Request.

REQUEST FOR PRODUCTION NO. 33:

Documents identifying any Person or entity other than Your employees - including, but not limited to, advertising agencies and all employees of advertising agencies - involved in the marketing of the Products from January 1, 2006, to the present.

RESPONSE TO REQUEST FOR PRODUCTION NO. 33:

In addition to the General Objections stated above, General Mills objects to the phrases "Documents identifying" and "involved in the marketing" on the grounds that they are overbroad, unduly burdensome, vague, and ambiguous.

Subject to and without waiving the General and Specific Objections stated above, General Mills will produce any non-privileged documents responsive to this Request from the files of designated document custodians, after a reasonably diligent search of their files by applying an agreed-upon keyword search filter and reviewing the results.

REQUEST FOR PRODUCTION NO. 34:

All Documents concerning any policy, procedure, or practice of document preservation by General Mills.

RESPONSE TO REQUEST FOR PRODUCTION NO. 34:

In addition to the General Objections stated above, General Mills objects to the phrases "all Documents concerning" and "any policy, procedure, or practice" on the grounds that they are overbroad, vague, and ambiguous.  General Mills further objects to the Request on the ground that it seeks documents and information protected by the attorney-client privilege and/or work product doctrine.

REQUEST FOR PRODUCTION NO. 35:

All Documents identified or referred to in Plaintiffs First Set of interrogatories.

RESPONSE TO REQUEST FOR PRODUCTION NO. 35:

Subject to and without waiving the General Objections stated above, General Mills will produce any non-privileged documents responsive to this Request.

By:     _/s/ Stephen M. Orlofsky_____

**BLANK ROME LLP**
Stephen M. Orlofsky
David C. Kistler
301 Carnegie Center, 3rd Floor
Princeton, NJ  08540
Phone:  609-750-2646
Fax:  609-897-7286

and

**PERKINS COIE LLP**
David T. Biderman (*Admitted Pro Hac Vice*)
4 Embarcadero Center, Suite 2400
San Francisco, CA 94111
Phone: 415-344-7000
Fax: 415-344-7050

Kathleen M. O'Sullivan (*Admitted Pro Hac Vice*)
Joseph M. McMillan (*Admitted Pro Hac Vice*)
Charles C. Sipos (*Admitted Pro Hac Vice*)
1201 Third Avenue, Suite 4800
Seattle, WA  98101
Phone:  206-359-8000
Fax:  206-359-9000

and

**O'MELVENY & MYERS LLP**
Jeffrey J. Fowler (*Admitted Pro Hac Vice*)
400 S. Hope Street
Los Angeles, CA 90071
Telephone:  (213) 430-6404
Facsimile:  (213) 430-6407
E-mail:  jfowler@omm.com

*Attorneys for Defendant*

1

## PROOF OF SERVICE BY MAIL

2          I am over the age of eighteen years and not a party to the within action.  I

3   am a resident of or employed in the county where the service described below occurred.

4   My business address is 400 South Hope Street, Los Angeles, California  90071-2899.  I

5   am readily familiar with this firm's practice for collection and processing of

6   correspondence for mailing with the United States Postal Service.  In the ordinary course

7   of business, correspondence collected from me would be processed on the same day, with

8   postage thereon fully prepaid and placed for deposit that day with the United States Postal

9   Service.  On July 26, 2012, I served the following:

10
11          **GENERAL MILLS' OBJECTIONS AND RESPONSES**
       **TO PLAINTIFF'S FIRST REQUEST FOR**
       **PRODUCTION OF DOCUMENTS**

12   by putting a true and correct copy thereof in a sealed envelope, with postage fully prepaid,

13   and placing the envelope for collection and mailing today with the United States Postal

14   Service in accordance with the firm's ordinary business practices, addressed as follows:

15
16       Michael R. Reese                Richard H. Weiss
    Reese Richman LLP           Milberg LLP
17       875 Avenue of the Americas, 18th Flr.   One Pennsylvania Plaza
    New York, NY  10001          New York, NY  10119-0165

18
19       Bruce D. Greenberg
    Lite DePalma Greenberg LLC
20       Two Gateway Center, Suite 1201
    Neward, NJ 07102

21          I declare under penalty of perjury under the laws of the State of California

22   that the above is true and correct.  Executed on July 26, 2012, at Los Angeles, California.

23

24

25   _____
       Mila Sucgang

26

27

28